**Allen C. KAISER, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE and National Rural Letter Carriers' Association, Defendants.**

No. 90–CV–71356–DT.

United States District Court, E.D. Michigan, S.D.

March 2, 1992.

Bruce B. Elfvin, Cleveland, Ohio, for plaintiff.

Peter A. Caplan, U.S. Atty., Detroit, Mich., Anthony W. DuComb, Washington, D.C., Michael Kimber, Southfield, Mich., for defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. *INTRODUCTION*

This matter is before the Court on the Motions to Dismiss, or in the alternative, for Summary Judgment filed by the Defendants, the United States Postal Service (the "USPS" or the "Postal Service") and the National Rural Letter Carriers' Association (the "NRLCA"). The parties have waived oral argument.

In the instant action, Plaintiff Allen C. Kaiser, a former non-rural letter carrier, challenges his reduced salary resulting from his requested transfer from a "city carrier" position to that of a "rural carrier". Plaintiff has asserted a claim under 39 U.S.C. § 1208(b) alleging that, in processing his grievance, the NRLCA breached its duty of fair representation, and that, by reducing his salary when he transferred positions, the USPS breached the collective bargaining agreement that governed his employment. He has also alleged a claim of equitable estoppel against the Postal Service, contending that because his supervisors represented to him prior to transferring that he would not experience an cut in pay, the Service is estopped from reducing his salary.[1]

## II. *FACTUAL BACKGROUND*

### A. PLAINTIFF'S TRANSFER TO HIS RURAL LETTER CARRIER POSITION

Plaintiff Allen Kaiser is a United States Postal Service letter carrier. He has been employed by the USPS since 1977. Since September 1987, Kaiser's employment relationship with the Postal Service has been governed by the collective bargaining agreement (the "CBA") entered into between the USPS and the National Rural Letter Carriers Association.

Prior to September 26, 1987, Kaiser was employed by the USPS as a "city carrier". Pursuant to the city carriers' "PS schedule", Kaiser's rate of pay was at grade 5, step 0, which provided him an annual salary of $27,401.00.

In 1987, Kaiser—who had in January of that year taken and passed the rural carrier examination, and had been placed on the rural carrier eligibility roster—requested a transfer to a "rural carrier" position. He was subsequently offered, and accepted, a rural carrier position in Saline, Michigan. Upon his reassignment to the rural carrier position on September 26, 1987, Kaiser's employment became covered by the USPS/NRLCA collective bargaining agreement.

Kaiser alleges that, prior to his transfer, USPS officials made representations to him that his salary would not be reduced as a result of his reassignment. However, following his reassignment, Kaiser's salary was reduced to $19,541.00 per year, corresponding to "Level 00, Step B" on the "RC schedule".

"Step B" is the lowest step on the RC schedule. That step was created in January 1985 as part of the "Volz award" (discussed, *infra*) and has been provided for in Article 9 of the USPS/NRLCA collective bargaining agreement ever since.

### B. THE PROVISIONS OF ARTICLE 9.1.B.1 OF THE CBA

The circumstances giving rise to the genesis of Step B are as follows. In 1984, the NRLCA and the Postal Service were unable to agree upon the terms of a collective bargaining agreement. In accordance with 39 U.S.C. § 1207(c), the dispute was referred to binding arbitration, and a three-member panel, made up of a representative from each the USPS and the NRLCA, and headed by Arbitrator Marlin Volz, issued an award determining the terms of an agreement covering the period from 1984 through 1987 (the "Volz award"). Part of that award was the creation of Article 9.1.B.1. This section of the CBA established a new entry wage level, known as "Step B". Step B was made applicable to all new regular [as opposed to substitute] rural letter carriers.

Article 9.1.B.1 provides in pertinent part: There shall be a new Rural Carrier Evaluated Schedule, which expands each evaluated level to 14 steps by adding two (2) new lower steps. These two (2) lower steps shall be designated Steps B and C. (There shall be no Step A.) Effective January 19, 1985, all new regular carrier appointees will begin at Step B, except substitute rural carriers who convert to regular status. Substitute rural carriers

---

**1.** Plaintiff also includes in his Complaint "Class Allegations" however, no motion for class certification has ever been filed. Nonetheless, because of the resolution of Defendants' Motions, it is unnecessary for the Court to address any "class" issues.

will be converted to regular carrier status at Step 8 or their existing Step, whichever is lower, provided, however, that substitutes serving in excess of ninety (90) days on a vacant route at the time of conversion will convert at their existing step.

[See NRLCA's Ex. 8, p. 3.]

In 1988, the NRLCA and the Postal Service negotiated a successor agreement in which Article 9's Step B provisions [with the exception of increased dollar amount of wages] were carried forward without change, although during contract negotiations the union has sought an amendment of those provisions.[2]

### C. PLAINTIFF'S FIRST LAWSUIT (KAISER I)

On November 17, 1987 Kaiser filed a grievance in accordance with the CBA's grievance and arbitration provisions seeking an upward adjustment of the reduction in his annual salary that occurred when he transferred from his city carrier position to that of a rural carrier. Then in June 1988, while arbitration of that grievance was pending, Kaiser also instituted a lawsuit in this Court (*"Kaiser I"*).

In *Kaiser I*, Plaintiff sued the NRLCA and the Postal Service under 39 U.S.C. § 1208(b), alleging a breach of duty of fair representation claim against the union and a breach of collective bargaining agreement claim against the Postal Service. He also claimed (1) that he had an implied right of action against the Postal Service under 39 U.S.C. § 1006, which establishes career postal employees' right of transfer, and (2) that by virtue of the representations of USPS supervisors made to him prior to his transfer that he would not experience a cut in pay upon his transfer to the rural carrier position, an "equitable estoppel" was created which precluded the Postal Service from reducing his salary.

In March 1989, both the USPS and the NRLCA moved for summary judgment. Judge Suhrheinrich granted the defendants' motions on April 27, 1989. In his Memorandum Opinion and Order dated April 27, 1989, Judge Suhrheinrich held that no private cause of action exists under 39 U.S.C. § 1006, as a matter of law, and therefore dismissed that claim. He also dismissed Kaiser's remaining claims because of Kaiser's failure to exhaust his contractual arbitration remedies.

Kaiser subsequently appealed Judge Suhrheinrich's ruling. On July 10, 1990, the Sixth Circuit decided that appeal and affirmed Judge Suhrheinrich. *See, Kaiser v. United States Postal Service,* 908 F.2d 47 (1990). Kaiser then filed a Petition for Writ of Certiorari with the Supreme Court. The Petition was denied on January 11, 1991. *See, Kaiser v. United States Postal Service,* —— U.S. ——, 111 S.Ct. 673, 112 L.Ed.2d 665 (1991).

### D. ARBITRATION OF PLAINTIFF'S GRIEVANCE

In the meantime, during the district court and appellate court pendency of *Kaiser I,* the NRLCA proceeded with Kaiser's grievance.

By letter dated November 14, 1988, William Peer, General Counsel for the NRLCA informed Mr. Kaiser that his grievance was of the same kind and character of 10 or 11 other grievances that the union was processing through the grievance/arbitration procedures. As with Kaiser's grievance, these other grievances involved cases where there was evidence of the carriers' reliance upon misinformation and/or misrepresentations by Postal Service officials. Peer's letter informed Kaiser that the union had decided to consolidate his grievance with these other misinformation/misrepresentation grievances and submit them for National level arbitration in a consolidated proceeding. The information that Mr. Peer provided in his November 14, 1988 letter was confirmed in a subsequent February 1989 letter to Mr. Kaiser.

---

**2.** The Union sought amendment of Article 9.1.B.1 in contract negotiations in 1987, and again in 1990. However, no agreement could be reached with the Postal Service on such an amendment.

On June 7, 1989, the National level arbitration hearing was held before National Arbitrator Nicholas Zumas. The union took the position before the arbitrators that although they agreed with the Postal Service that the contract language explicitly states that the "carry over" salary features of Article 9 of the CBA applied only to substitute employees, it had decided that, based upon concepts of fairness, and in accordance with its duty of fair representation, it would pursue the grievances of employees who could establish to the satisfaction of the union that they had relied upon misrepresentations from the Postal Service in taking employment within the rural carrier craft, and seek full equitable estoppel remedies on behalf of those employees. [See NRLCA's Ex. 5, pp. 12–13.] It was these issues that were presented to the National arbitrators for resolution.

Both the union and the Postal Service submitted briefs presenting the factual and legal bases for their respective positions regarding these issues. Then, during the course of the June 7, 1989 National arbitration hearing, the union and the Postal Service submitted documentary evidence and presented testimony to further support their positions.

Among the evidence submitted to the arbitrators were articles that had appeared in the union's journal, *The National Rural Letter Carrier*, shortly after the January 1985 adoption of Volz award which created Article 9.1.B.1. These articles advised the membership that the union's National Board intended and interpreted Article 9.1.B.1 as excepting from the "carry over" salary protection provisions which covered current "substitute" rural carriers, those persons appointed to a regular rural carrier position from an eligibility roster resulting from the rural letter carrier examination. [NRLCA Ex. 8, pp. 4–5.]

Also submitted as evidence at the arbitration hearing were documents and testimony that the Postal Service also interpreted Article 9.1.B.1 as providing that "[E]xcept for substitute rural carriers, *all* new regular carrier appointees, whether they are from within or without the Postal Service, are to be placed in the regular rural carrier position at Step B." (emphasis in original.) [Ex. 8, p. 5.] *See also* Ex. 8, p. 6, "A regular craft employee (non-rural) being placed into rural carrier position would be considered a "new appointee" to the rural carrier craft and would be placed in a Step B regardless of the step attained in the previous position."

Evidence was also submitted that since adoption of Article 9.1.B.1, 2,060 new regular rural carriers had been appointed, many of whom had transferred from other postal craft positions, including city carrier positions.

## E. THE NATIONAL ARBITRATION PANEL'S DECISION

The National arbitration panel considered the foregoing evidence and other testimony regarding the meaning of Article 9.1.B.1 as well as the misinformation/misrepresentations made by Postal Service officials to the grieving employees, and also considered the union's and the Postal Service's legal arguments regarding the use of equitable estoppel in the case of the 11 grievants.

On November 15, 1989, Arbitrator Zumas issued the arbitration panel's award (the "Zumas award"). In that award, Arbitrator Zumas found that "as a matter of law, there is no enforceable estoppel against the Service." He further determined that

> The Agreement is clear on its face as to the salary for employees entering Regular Rural Carrier positions who are not substitute Rural Carriers. The "non-substitute Rural Carriers" are "new regular carrier appointees" under the Agreement whether they are newly entering Postal Service employment or transferring from another craft. As "new" regular carriers, these employees are to receive compensation at salary level Step B. This system was plainly understood by more than 2,000 employees, many of whom transferred from another craft and have never alleged to have expected to receive compensation at their prior attained salary level.

The 11 Grievants somehow did not understand that they would not maintain their attained salary level. Indeed, they were under the impression that they would retain it. The parties stipulated that there was a "misrepresentation" to Grievants on this issue by the Service's supervisory employees. This Arbitrator notes, however, that there is no stipulation that the misrepresentation was made in bad faith and interprets this stipulation to mean only that the Service concedes that supervisory employees conveyed misinformation to Grievants.

\* \* \* \* \* \*

There is no basis in this record that would allow a conclusion that the elements of estoppel have been satisfied. First, there is clear evidence ... that the Union fully understood the plain and proper meaning of Article 9, Section 1.B.1. (later 9.1.C). Next, it is also clear from the record that neither the Union nor the Service had ever assumed that either the shop steward or the local Postmaster could change the terms of the Agreement....

\* \* \* \* \* \*

Second, there is no proof that Grievants *reasonably* relied on whatever representations were made by their supervisors. Indeed the clear evidence is that their reliance was unreasonable. Grievants ere exposed to a torrent of information about the terms of the Agreement as to salary for new Rural Carriers and who those carriers would be. Postal employees received that information in *The National Rural Letter Carrier* articles about the new Agreement terms as stated in the Volz decision. They had available to them the Agreement itself either directly or through their shop steward or Postmaster. If there was any question, the shop steward could at least consult with them on the meaning of the Agreement provision. When the Union adopted resolutions attempting to change the Agreement term, that was clearly reported in *The National Rural Letter Carrier.*

\* \* \* \* \* \*

In the absence of either an authorized statement by a person empowered to make the representation, or reasonable reliance on the part of the person who allegedly detrimentally relied [upon it], there can be no estoppel against the Service as a matter of law. Additionally, the evidence in the record clearly shows that if the question of affirmative misconduct were explored, there would be no basis to show that it existed. There is not even a hint, in this record, of a willful attempt by the Service to deceive Grievants and to induce them to act against their own interests by transferring. The record reveals that there is no question that any misinformation received from Postmasters or supervisors was an innocent error; this is not the grounds on which estoppel is based.

[NRLCA's Ex. 8, pp. 15–20 (emphasis in original).]

Thus, on November 15, 1989, Kaiser's, and the other 11 aggrieved rural carriers' grievances were denied.

## F. PLAINTIFF'S INSTITUTION OF THIS LAWSUIT

On May 11, 1990 Kaiser instituted the instant lawsuit, alleging, as he did in *Kaiser I,* a breach of duty of fair representation claim against the union and a breach of collective bargaining agreement claim against the Postal Service, under 39 U.S.C. § 1208(b), and also alleging—as he did in *Kaiser I,* and as his union argued before the National arbitration board—a claim of "equitable estoppel" predicated upon representations of USPS supervisors made to him prior to his transfer that he would not experience a cut in pay upon his transfer to the rural carrier position.

The factual allegations of Kaiser's Complaint in this action are virtually identical to those alleged in his complaint in *Kaiser I,* with the additional allegations regarding the June 7, 1989 arbitration hearing and the November 15, 1989 denial of his grievance, and that he "has fully exhausted all contractual remedies" (Complaint para.

15(b)). Kaiser also has added additional allegations of union misconduct, that:

12. For wholly arbitrary, invidious and discriminatory reasons defendant NRLC refused and failed to process plaintiff's grievance at all until after plaintiff commenced litigation;

and

13. Defendant NRLC manipulated the grievance process and handled plaintiff's grievance in a perfunctory manner.

[Complaint, para. 12, 13.]

## G. DEFENDANTS' MOTIONS TO DISMISS, OR FOR SUMMARY JUDGMENT

Both the Postal Service and the NRLCA have filed Motions to Dismiss, or, in the alternative, for Summary Judgment.

The NRLCA raises three arguments for dismissal/summary judgment. First, it argues that Kaiser's Complaint in this lawsuit is barred by the doctrine of *res judicata* because his allegations and claims in this suit were raised, or could have been raised, in *Kaiser I,* and because the Court dismissed Plaintiff's complaint in *Kaiser I,* Kaiser is precluded from "relitigating" those claims in this action.

Second, the NRLCA contends that Plaintiff's Complaint is time-barred under *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), because it was filed more than six months after he knew what issues the union was pursuing on his behalf in the National arbitration proceedings.

Finally, the union argues that Kaiser has no factual or legal basis for his claim of breach of duty of fair representation because he cannot establish invidious discrimination against him or some other unlawful conduct on the part of the NRLCA, and,

therefore, there is no legal basis to vacate the arbitration Award.

The USPS argues in its Motion that because Plaintiff's claims against the Service were decided by Arbitrator Zumas in November of 1989, and because that arbitration decision draws its essence from the collective bargaining agreement, as a matter of law Kaiser cannot prevail on his claims against the Postal Service in this action.[3]

Because both of the Defendants' Motions present materials outside of the pleadings, pursuant to Fed.R.Civ.Pro. 12(b), the Court will treat them as Motions for Summary Judgment under Fed.R.Civ.Pro. 56.

Plaintiff has responded to Defendants' Motions, to which Responses, Defendants have replied.

## III. *ANALYSIS*

## A. THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT

The standards governing a trial court's consideration of motions for summary judgment were redefined by the United States Supreme Court in three 1986 cases: *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit expressly adopted this "new era" in summary judgment practice in its recent decision in *Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989), and delineated in that case the principles extracted from the 1986 Supreme Court trilogy and their progeny that are to guide

---

**3.** The NRLCA has also filed a "Motion to Strike the Unsworn Declaration of Plaintiff's Counsel". The Court has reviewed and considered this Motion, and has also reviewed and considered Plaintiff's Brief in Opposition to that Motion. The NRLCA contends that Plaintiff's Counsel's declaration and exhibits should be stricken arguing that "the statements and exhibits are not proper submissions under Rule 56(f)." The Court sees no merit in Defendant's contention. With respect to Defendant's other arguments for striking the declaration, they go essentially to the contents of what is alleged in the Declaration and do not provide a basis for striking the document from the pleadings. Accordingly, Defendant NRLCA's Motion to Strike will be denied.

trial courts in this circuit in deciding motions for summary judgment:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.*, the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

886 F.2d at 1478–1480 [footnotes omitted].

The Court will decide the motions before it by application of the foregoing principles.

### B. PLAINTIFF'S COMPLAINT IN THIS ACTION IS NOT TIME–BARRED

As discussed above, Plaintiff has alleged in his Complaint that the NRLCA violated its duty of fair representation and that the USPS has breached the collective bargaining agreement. Such a "hybrid" action is subject to a six-month statute of limitations. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 169.-172, 103 S.Ct. 2281, 2293–2295, 76 L.Ed.2d 476 (1983).[4] *DelCostello* left open, however, the issue of when such a claim accrues.

Plaintiff contends that his claim accrued on November 15, 1989 when Arbitrator Zumas issued his award in the arbitration proceeding concerning his grievance. Defendant NRLCA contends that because

---

**4.** The bulk of breach of duty of fair representation/breach of contract claims arise under Section 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185(a). 39 U.S.C. § 1208(b), under which Plaintiff in this case brings his breach of duty of fair representation/breach of contract claims, is the statutory analogue to Section 301 applicable to Postal Service employees. Thus, the basic principles of labor law which have evolved under hybrid Section 301 cases are equally applicable to the instant action. *See, American Postal Workers Union v. Bolger*, 621 F.2d 615 (4th Cir.1980); *National Association of Letter Carriers v. United States Postal Service*, 590 F.2d 1171 (D.C.Cir. 1978); *Melendy v. United States Postal Service*, 589 F.2d 256 (7th Cir.1978). *See also, Bowen v. United States Postal Service*, 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983) and *Kaiser v. United States Postal Service*, 908 F.2d 47, 49 (6th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 673, 112 L.Ed.2d 665 (1991) (both cases applying Section 301 labor principles to DFR/breach of contract cases under 39 U.S.C. § 1208(b)).

Plaintiff alleges in his Complaint that the union "manipulated the grievance process and handled [his] grievance in a perfunctory manner" he is contending, with respect to the manipulation charge, that the union proceeded to arbitration on the wrong issue and, with respect to the perfunctory handling charge, that it failed to invite him to participate at the arbitration hearing to present his own testimony. The NRLCA claims that Plaintiff had notice of these DFR claims well before the November 15, 1989 issuance of the arbitrator's decision.

The union contends that Plaintiff's "manipulation" claim accrued, with respect to the manipulation charge, at the latest in February 1989 when the Plaintiff received the letter from the union confirming what he had previously been told in November 1988 as to what the issue to be arbitrated would be. On the perfunctory handling charge, the NRLCA contends that this claim accrued on June 7, 1989, the date of the National arbitration hearing, the hearing at which Plaintiff contends that he should have been invited to appear and allowed to testify.

Because Plaintiff's Complaint was filed on May 11, 1990, within six months of the arbitration decision but well beyond six months after the February 1989 letter from the union and 11 months after the June 7, 1989 arbitration hearing, Defendant NRLCA contends that under the *DelCostello* statute of limitations, Plaintiff's Complaint is time-barred.

The Court finds no merit in the union's statute of limitation argument.

 Courts that have considered the issue of what event commences the limitations period in hybrid breach of contract/DFR cases that have proceeded to arbitration have virtually universally held that the period of limitations does not begin to run at least until the arbitration award is issued. *See e.g., Ghartey v. St. John's Queens Hospital,* 869 F.2d 160, 163–164 (2d Cir.1989); *Galindo v. Stoody Co.,* 793 F.2d 1502, 1509 (9th Cir.1986); *Samples v. Ryder Truck Lines, Inc.,* 755 F.2d 881, 887 n. 7 (11th Cir.1985).

The reasons for such a rule were explained by the Court in *Lucas v. Mountain States Telephone and Telegraph,* 909 F.2d 419 (10th Cir.1990):

> When a union represents an employee throughout a grievance procedure, a claim challenging the adequacy of that union's representation normally does not accrue until the dispute process has been *completely* exhausted. Exhaustion of the grievance process is appropriate in such cases because the possibility exists that an employee can be made whole by the grievance process and therefore have no claim against his union even if his union failed to exercise due care.

*Id.* at 421. *See also, Childs v. Pennsylvania Federation Brotherhood of Maintenance Way Employees,* 831 F.2d 429, 434–435 (3d Cir.1987) (To require a district court to consider a suit by a plaintiff "who may yet prevail in the pending arbitration proceeding would be an intolerable drain on precious judicial resources." *Id.*)

*Dowty v. Pioneer Rural Electric Cooperative, Inc.,* 770 F.2d 52, 56–57 (6th Cir. 1985), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 572, 88 L.Ed.2d 557 (1985)—which the NRLCA relies upon in support of its "Plaintiff-had-knowledge-before-the-arbitration-award" argument—is entirely consistent with the above-cited authorities. In that case, the defendant did not argue that the limitations period had begun to run prior to the entry of an arbitration decision; rather, the *plaintiff* tried to *extend* the six-month limitations period for the filing of his Section 301 breach of contract/DFR suit by arguing that the limitations period did not begin to run until he actually *received* a printed copy of the arbitration award two weeks after the arbitration decision was entered. The court rejected Dowty's argument because he had been apprised of all of the facts regarding the arbitration of his grievance and the arbitrator's decision in a post-arbitration meeting with his union representatives *before* that date.

 Here, it is undisputed that Plaintiff filed his Complaint in this action within six months of November 15, 1989 arbitration decision. Therefore, the Court finds that the Complaint was timely filed, and Defendant NRLCA's motion for summary judg-

ment on statute of limitations grounds will be denied.

## C. PLAINTIFF'S COMPLAINT IS NOT BARRED UNDER THE DOCTRINE OF RES JUDICATA

■ Defendant NRLCA also argues that Plaintiff's Complaint in this action is barred by the doctrine of *res judicata.* *Res judicata* bars a second suit involving the same parties or their privies based on the same cause of action where there has been a prior judgment *on the merits.* *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).[5]

■ Defendant NRLCA does not dispute that Judge Suhrheinrich's ruling dismissing Plaintiff's hybrid Section 1208(b) claims in *Kaiser I* was not a dismissal "on the merits". As Judge Suhrheinrich made clear in his Memorandum Opinion and Order, *Kaiser I* was dismissed because Plaintiff had not then yet exhausted his grievance/arbitration remedies, which is a jurisdictional prerequisite to proceeding with a judicial hybrid breach of contract/DFR action.

Rather, the NRLCA contends that an excerpt from the Sixth Circuit's decision affirming Judge Suhrheinrich's ruling constitutes a judgment on the merits on the issue presented in paragraph 12 of Plaintiff's Complaint that "[f]or wholly arbitrary, invidious, and discriminatory reasons, defendant NRLC refused and failed to process plaintiff's grievance at all until after plaintiff commenced litigation."

As an initial matter, the Court notes that paragraph 12 of Plaintiff's Complaint in this action is not identical to the allegation regarding the union's failure to process his grievance contained in his complaint in *Kaiser I.* In paragraph 11 of the previous complaint, Plaintiff complained about the union's delay in proceeding with his grievance to step 2 of the grievance procedure

and its subsequent remand to grievance step 1 for further consideration and possible appeal by the union.

More importantly, the excerpt from the Sixth Circuit's opinion affirming the district court in *Kaiser I,* is an excerpt from that portion of the opinion in which the court discussed Plaintiff's contention that he did not have to exhaust his grievance/arbitration remedies before filing suit because exhaustion would be futile.

After discussing the general rule for application of the "futility" exception to the total exhaustion requirement, the Sixth Circuit went on to discuss the district court's determination that the futility exception did not apply:

The District Court expressly found "no serious suggestion of any basis for finding that exhaustion of plaintiff's internal appeal rights will be futile" and held that exhaustion before filing his federal action was not excused.

908 F.2d at 49.

The appellate court then went on to discuss the factual arguments advanced by Plaintiff in support of his futility argument:

Appellant points to delay and animosity on the part of Knight and Smith in processing his grievance. However, most, if not all, of the delay was caused by appellant's unwillingness to comply with the union's demand that it be furnished with original documents. Moreover, the fact that appellant's grievance was processed to arbitration belies his assertion that the union wrongfully refused to process his grievance once given the required documents. We agree with the District Court that appellant was required to and failed to exhaust his administrative remedies.

*Id.* at 49–50.

This is the excerpt that the NRLCA contends is a "judgment on the merits" of

**5.** Although the NRLCA has phrased its argument as claim preclusion under *res judicata,* it is probably more appropriately a claim of issue preclusion under the doctrine of collateral estoppel. *Res judicata* and collateral estoppel apply to related but distinct doctrines. Under *res judicata,* parties to a final judgment or their privies are barred from bringing further claims

arising from the same cause of action. Under collateral estoppel, a determination on the merits of an issue by a court of competent jurisdiction is conclusive in subsequent cases, even if they are based on a different cause of action, if the two action involve a party or its privies to the prior suit.

Plaintiff's DFR claim that the union wrongfully refused to process his grievance before he filed a judicial action. The excerpt itself makes it abundantly clear that the Sixth Circuit was not deciding whether the union breached its duty of fair representation. All that the appellate court addressed in that part of its opinion was whether Plaintiff had sufficiently made out an argument that he was excused from exhausting his contractual remedies under the futility exception.

Furthermore, the ultimate ruling of the Court of Appeals makes it clear that that court did not intend its ruling to be anything other than an affirmance of the district court's dismissal *for failure to exhaust contractual remedies:*

> *Because appellant failed to exhaust available remedies as provided in the collective bargaining agreement, his claim under 39 U.S.C. § 1208(b) was properly dismissed.* His claim under section 1006 [which Plaintiff has not reasserted this time around] was also properly dismissed because there is no indication that Congress intended the private cause of action asserted by appellant. Accordingly, the judgment of the District Court is AFFIRMED.

908 F.2d at 52 (emphasis added).

In sum, the Court does not find a legally sufficient basis to invoke the doctrine of *res judicata* or collateral estoppel as a basis for entry of summary judgment in favor of Defendants in this action. Therefore, the Court will deny the NRLCA's Motion for Summary Judgment under this theory.

### D. THE MERITS OF PLAINTIFF'S HYBRID SECTION 1208(b) CLAIMS FOR BREACH OF CONTRACT AND BREACH OF DUTY OF FAIR REPRESENTATION

1. *Interdependency of Plaintiff's Claims Against His Employer and His Union*

■ The Supreme Court and Sixth Circuit have consistently held that a plaintiff in a hybrid breach of contract/breach of duty of fair representation action must prove *both* that the union breached its duty of fair representation *and* that the employer breached the collective bargaining agreement. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990); *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *White v. Anchor Motor Freight, Inc.,* 899 F.2d 555 (6th Cir.1990).

■ In passing labor laws, Congress intended, in part, to encourage dispute resolution by the parties themselves through mutually satisfactory mechanisms negotiated in the collective bargaining process:

> Experience has proven that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

29 U.S.C. § 151. The courts have recognized that this congressional intent could be effectuated "only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976) (quoting *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 566, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960)). The *Hines* Court added that

> [t]hey [courts] should not undertake to review the merits of arbitration awards but should defer to the tribunal chosen by the parties finally to settle their disputes. Otherwise "plenary review by a

court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final."

*Id.* (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960)). The courts have thus shown great deference to the dispute resolution mechanisms chosen by the parties to a labor dispute.

However, when a union has failed adequately to represent an employee, the courts have interfered to resolve the dispute. As noted by the Supreme Court:

Under this doctrine [duty of fair representation], the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). Thus, if a court finds that the union has breached its duty of fair representation, it will not hesitate to review and resolve the dispute. Conversely, however, absent a finding of bad faith, discrimination, or arbitrariness on the part of the union, the courts will not interfere in the internal grievance process.

The "interdependency" of a union employee's claims against his employer for breach of a collective bargaining agreement and against his union for breach of its duty of fair representation is well-established in this Circuit. *See, e.g., Lucas v. Leaseway Multi Transportation Service, Inc.*, 738 F.Supp. 214, 220 (E.D.Mich.1990), *aff'd*, 929 F.2d 701 (6th Cir.1991) ("Since plaintiff's count as to the duty of fair representation fails, plaintiff's other count alleging a breach of the CBA also must fail"). Conversely, without a valid claim against the employer, the union could not be challenged because no duty to the employee would have been triggered. *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir.1990) ("if the first claim

anchored in the employer's alleged breach of the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it"). This interdependence of claims in the § 301 context has been noted and approved by the Sixth Circuit:

In this hybrid suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to recover against *either* the Company *or* the Union, Bagsby must show that the Company breached the Agreement *and* that the Union breached its duty of fair representation. Unless Bagsby demonstrates *both* violations, he can not succeed against either party.

*Bagsby v. Lewis Bros., Inc.*, 820 F.2d 799, 801 (6th Cir.1987) (citation omitted) (emphasis in original). *See also Black v. Ryder/P.I.E. Nationwide, Inc.*, 930 F.2d 505, 510 (6th Cir.1991) ("In any event, when the union cannot be held liable for unfair representation, of course, the employer cannot be held liable for breach of the collective bargaining agreement").

Although the foregoing basic principles of labor law evolved under hybrid actions arising under Section 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185(a), as noted *supra*, since Section 1208(b) of the Postal Reorganization Act, 39 U.S.C. § 1208(b), is the statutory analogue of Section 301 of the LMRA, Section 301 cases are equally applicable in Section 1208(b) actions.[6]

Therefore, it is axiomatic in this hybrid Section 1208(b) action that a determination of lack of merit of either Plaintiff's claim against his union or his claim against his employer necessarily dispenses with the entire action.

### 2. *Duty of Fair Representation*

#### (a) General Standards

The Supreme Court set the parameters of the duty of fair representation in the seminal case of *Vaca v. Sipes, supra.* As

---

**6.** See cases cited in note 4, *supra.*

to what is required to establish a union's breach of its duty, the *Vaca* court stated:

A breach of the statutory duty of fair representation occurs *only* when a union's conduct toward a member of the collective bargaining agreement is arbitrary, discriminatory or in bad faith.

87 S.Ct. at 916 (emphasis added).

The *Vaca* court further determined that a union should be afforded discretion in supervising the grievance and arbitration machinery and in determining the merits of a grievant's complaints before proceeding to arbitration. The court explained the policy behind affording the union discretion to determine what merit, if any, there is in an employee's grievance:

In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement.

If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievance would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so over-burden the arbitration process as to prevent it from functioning successfully.

87 S.Ct. at 917.

With that policy in mind, the Supreme Court went on to hold that a union will not be deemed to have breached its duty of fair representation in exercising the discretion afforded to it in administering the grievance and arbitration machinery as statutory agent of the employees with respect to determining the merits of particular grievances unless it is found to have made that merit determination in bad faith or acted in an arbitrary manner. 87 S.Ct. at 919.

In *Air Line Pilots Association, International v. O'Neill*, ── U.S. ──, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), the Court further delineated what would constitute "arbitrariness" under the *Vaca* standard:

We further hold that *a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness" as to be irrational.* *O'Neill*, 111 S.Ct. at 1130 (emphasis added) (citation omitted).

■ Moreover, merely characterizing a union's conduct as "arbitrary", "perfunctory" or demonstrative of "bad faith" is insufficient to withstand summary judgment. Rather, to meet his burden of proof as to the union's breach of its duty of fair representation, a plaintiff must establish by *substantial evidence* that the union acted arbitrarily, discriminatorily or with bad faith. *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971); *Ratkosky v. United Transportation Union*, 843 F.2d 869 (6th Cir.1988) (summary judgment granted where plaintiff fails to make a showing of bad faith, discrimination or arbitrary conduct).

The Court will use the above standards to determine whether the union's actions in the instant case amounted to a breach of its duty of fair representation.

(b) Plaintiff's Claims of Union Misconduct

In this case, Plaintiff's claims of the union's breach its duty of fair representation

are predicated on his allegations that (1) the NRLCA refused and failed to process his grievance in any manner which addressed the central issues of the "contract" and (2) manipulated and handled the arbitration proceedings in a perfunctory manner by not inviting him to attend the arbitration hearing to allow him to testify.

With respect Plaintiff's first allegation regarding the union refusing to address the central issues of the "contract" in presenting his grievance to the arbitrator, this allegation is predicated upon Plaintiff's assertion that the union should not have decided to limit submission of his grievance only on the "representations of supervisors/equitable estoppel" issue. Plaintiff contends that his union should have argued to the arbitrator that he was not subject to Article 9.1.B.1, but rather that his transfer to the rural carrier position was governed by the Section 424.221 of the Postal Service Employees Labor Relations Manual ("ELM"), which he claims he relied upon when he transferred to his rural carrier position. That section of the ELM provided:

> A postal employee reassigned from a position under a PS schedule to a rural carrier's position is placed (a) in the step of the RC schedule, which equals the employee's basic salary of [sic: or] (b) in the first step for the route which exceeds the employee's former basic salary be [sic: by] less than one full step, or (c) in the maximum step if the former basic salary is above the maximum step for the route.

[See para. 7 of Plaintiff's Complaint].[7]

However, the union disagreed with Plaintiff and determined that it would not present this argument to the arbitrators. [See NRLCA Ex. 1]. Rather, as the union's General Counsel, William Peer, advised Mr. Kaiser in November 1988 [see NRLCA Ex. 1],

> After hearing the new evidence presented by you during your deposition, I am satisfied that your case is of the same kind and character as several others the Association is processing through the grievance/arbitration procedures where there is evidence of the carrier's reliance upon misinformation and/or misrepresentations by Postal Service officials. Accordingly, upon my recommendation, the Association, through Mr. Knight, is appealing your grievance....

> My review of the material presently at hand suggests the Postal Service may offer one or more defenses to your grievance.... These defenses, and possibly others, make [sic: may] cause the Association to review the merits of your case and to respond accordingly. In the meantime, your case is being treated no different that the others. Mr. Knight will vigorously represent your position.

> It is not the Association's intention to press in its appeal the additional legal contentions urged by you in support of your case based upon what you referred to as your "contractual and statutory basis".... The Association does not concur in your allegation that it "is interpreting and enforcing a collective bargaining agreement incorrectly".... The Association continues to believe that your rights under the provisions cited have not been violated, and that the Association is properly interpreting and applying Article 9.1.B.... The only reason that your grievance is being pursued,

---

**7.** It appears that Plaintiff actually was initially told by Saline Postmaster Loren Heffington when he interviewed for the transfer to the rural carrier position in 1987 that, since he was coming to that position off of the rural carrier eligibility roster, he would be starting the same as would a new hire off the street. But since he was already a postal service employee, Heffington told him that he would check with personnel in Detroit to clarify his status. When Heffington called the Personnel office, Mrs. MacNeal, the official he spoke with quoted Section 424.211 to him, and based upon that provision of the Employee Relations Manual, told Heffington that Kaiser would not take a pay cut. Mr. Kaiser also called Mrs. MacNeal himself and she again quoted ELM Section 424.211 to him and sent him a copy of that provision.

When Kaiser got his first pay check, it reflected the Article 9.1.B.1 Step B reduced salary. Heffington telephoned the Central Region personnel office to attempt to correct the apparent mistake in Kaiser's salary. Officials from that office advised Heffington that there had been no mistake; that Article 9.1.B of the CBA superseded the ELM provisions.

and this applies to the other cases which are pending as well, is the facial evidence of misrepresentation and reliance. If you do not want the Association to pursue your grievance on these stated grounds, or if you what the Association to press your other contentions as well, the Association would respectfully decline to proceed, because your grievance would not state a meritorious claim of violation of Article 9.1.B. Unless and until I hear otherwise, I will assume you have no objection to the Association proceeding as stated above.

[NRLCA Ex.1.]

■ Thus, in processing his grievance, and arguing his grievance before the arbitrator, the union did not argue that ELM Section 424.221 applied to Mr. Kaiser or the other 10 grievants whose claims were being arbitrated. Rather, it presented grievances on the issue of whether, notwithstanding the union's agreement that there had been no "breach" of the CBA, as for these 11 grievants, Article 9.1.B.1 should not apply because of the misinformation/misrepresentations they had received prior to commencing employment as rural carriers. Thus, the ultimate arbitrated issue was whether the Postal Service, under the CBA and under the law, should be obligated to "honor its word" as represented to the 11 grievants by Postal Service officials.

As indicated above, under *Vaca,* a union is given wide discretion to determine the merits of an aggrieved employee's grievance claims. *Vaca v. Sipes, supra. See also, Ratkosky, supra,* 843 F.2d at 876 (union officials have a wide range of reasonableness in dealing with discretionary decisions); *Sargent v. International Brotherhood of Teamsters,* 713 F.Supp. 999, 1010 (E.D.Mich.1989) ("Unions are given considerable discretion in sifting out grievances and ... it suffices if a union decides in good faith on the basis of objective, rational criteria that the grievance lacks sufficient merit to justify the expense of arbitration." *Id.*); *Shepherd v. Chrysler Corp.,* 433 F.Supp. 950, 953 (E.D.Mich. 1977). As such unions may lawfully elect

not to arbitrate grievance claims that they determine lack merit. *Id.* at 953.

■ Furthermore, even if it is determined that an employee's grievance is meritorious, the union may, nonetheless, without breaching its duty of fair representation, decide not to submit the grievance to arbitration so long as that decision is based on rational and objective grounds. *Fritz v. Production Plated Plastics, Inc.,* 676 F.Supp. 148 (W.D.Mich.1987); *Curth v. Faraday, Inc.,* 401 F.Supp. 678 (E.D.Mich. 1975). And, as the Sixth Circuit cautioned, in evaluating these decisions, courts must be careful not to substitute their post-hoc judgment for that of the authorized labor organization. *Ratkosky, supra,* 843 F.2d at 876.

■ Thus, it is only where there is evidence that the union acted without concern or solicitude, or gave the claim only cursory attention that a breach of fair representation claim will lie. *Curtis v. United Transportation Union,* 700 F.2d 457, 458 (8th Cir.1983). However, mere negligence is not tantamount to arbitrariness under *Vaca. Seeley v. General Motors Corp.,* 526 F.Supp. 542 (E.D.Mich.1981). *See also, NLRB v. American Postal Workers Union,* 618 F.2d 1249, 1255 (8th Cir.1980) (mere negligence, poor judgment or ineptitude are insufficient to establish a breach of the duty of fair representation); *Findley v. Jones Motor Freight,* 639 F.2d 953 (3rd Cir.1981) (union's conduct was at most negligent, not arbitrary or perfunctory).

■ By application of the foregoing law to the facts of this case, the Court does not find that the union's decision not to present Plaintiff's argument regarding his being covered by ELM Section 424.211 as opposed to Article 9.1.B.1 of the CBA was not "so far outside a wide range of reasonableness as to be irrational".

Article 19, section 1 of the NRLCA/ USPS Agreement specifically states that no other handbook, manual or published regulation that directly relate to wages, hours or working conditions, as they apply to employees covered by this Agreement shall be construed to conflict with the pro-

visions of the Agreement. [See NRLCA Ex. 6]. In fact, both the Federal Circuit and the Ninth Circuit have expressly held with respect to the specific collective bargaining agreement and Employee Labor Relations Manual provisions at issue in this case that the provisions of the Agreement, *not* the ELM apply to rural carriers who transferred from city carrier positions after the 1985 Volz award adoption of Article 9.1.B.1. *See McGarigle v. United States Postal Service,* 904 F.2d 687, 961 (Fed.Cir.1990); *Stupy v. United States Postal Service,* 951 F.2d 1079 (9th Cir.1991).[8]

Furthermore, the Court notes that the NRLCA was acutely aware that its decision to only arbitrate the misinformation/misrepresentation equitable estoppel question "presented an inordinate dilemma". As the union's representative, Mr. Peer, explained in his opening argument before the Zumas arbitration panel:

... for the Association, this, of course, presented an inordinate dilemma. On the one hand, we were faced with the legal obligation to represent *all* employees within our craft and to extend to them the legal obligation of the duty of fair representation. On the other hand, we had the contract language, which stipulated quite clearly that the provision [CBA Article 9.1.B.1] only applied to substitute employees, as far as protecting their status.

The Association determined that, based upon elemental concepts of fairness, that four employees who came over with their eyes wide open, fully knowing what the pay level would be and having been correctly informed that it would be Level B, that for those employees no grievances would be pursued with respect to the slotting for salary positions. However, at the same time, the Association determined that if the employees could establish to the satisfaction of the Association's representatives that they had relied upon misrepresentations from the Postal Service, and relied to their detriment upon those misrepresentations in

taking employment within the Rural Carrier craft, then grievances would be pursued and the Association would seek full equitable estoppel remedy on behalf of those employees.

[NRLCA Ex. 5, pp. 12–13.]

Thus, it is clear that the union's decision not to proceed to arbitration was not made perfunctorily, arbitrarily or in bad faith. Therefore, the Court finds no breach of the NRLCA's duty of fair representation with respect to this claim.

With respect to Plaintiff's claim that the union breached its duty in not inviting him to attend the arbitration hearing to present his own testimony and evidence, the law is quite clear: a union is afforded wide discretion in deciding which evidence to submit and which witnesses should testify at an arbitration hearing, and, thus, no breach of duty of fair representation can be predicated upon such claims. *See e.g., Castelli v. Douglas Aircraft Co.,* 752 F.2d 1480, 1483 (9th Cir.1985); *Ethier v. United States Postal Service,* 590 F.2d 733 (8th Cir.1979); *Brown v. TWA, Inc.,* 569 F.Supp. 247 (W.D.Mo.1983), *aff'd,* 746 F.2d 1354 (8th Cir.1984); *Hagans v. Budd Co.,* 597 F.Supp. 89, 96 (E.D.Pa.1984); *Sargent v. International Brotherhood of Teamsters, supra,* 713 F.Supp. at 1010.

Thus, the Court finds no legal merit in Plaintiff's contention that the union breached its duty of fair representation in failing to invite him to attend the arbitration hearing and testify on his own behalf.

Plaintiff posits two arguments against entry of summary judgment on the issue of the NRLCA's duty of fair representation.

First, Plaintiff argues that his DFR claim necessarily involves questions of the union's motive or intent. He contends that such state of mind questions are not suited for summary judgment. In support of this contention, Plaintiff cites several Sixth Circuit cases at pp. 11–12 of his Brief in Response to the NRLCA's Motion. *How-*

---

**8.** The Court notes that in both of these cases, the plaintiffs were represented by the same attorney representing Plaintiff in this case.

ever, *all* of these cases *pre-date* the Supreme Court's 1986 summary judgment trilogy. More importantly, Plaintiff's reliance on these cases for the proposition that the law of this Circuit precludes entry of summary judgment when issues of motive or intent are involved is entirely misplaced, for, as indicated above, in 1989, the Sixth Circuit expressly ruled in *Street v. J.C. Bradford & Co., supra,* that *"Cases involving state of mind issues are not necessarily inappropriate for summary judgment."* 886 F.2d at 1479.

Second, Plaintiff argues that summary judgment would be inappropriate on this issue because he claims that he has not had an opportunity to complete discovery to demonstrate that the union's conduct was discriminatory, unreasonable, and in bad faith.

With respect to this contention the Court finds no factual merit. Through April 1991, the parties had for more than two years engaged in discovery. Indeed, the Court repeatedly denied the Defendant's motions for protective orders to stay discovery. Then, in April 1991, after this case had been ongoing for nearly a year—and after the more than two-year previous pendency of *Kaiser I*—Plaintiff *stipulated* to a Stay of Discovery, pending the Court's decision on the instant motions, which at that point had already been filed. He cannot now argue, in an attempt to withstand summary judgment, that he has not had adequate time to complete discovery.

Furthermore, although the instant Motions have been pending decision for quite some time, during this pendency, both Defendants *and* Plaintiff have filed numerous "supplemental" briefs in support of their respective positions regarding Defendants' Motions for Summary Judgment. *Nothing* has precluded Plaintiff from supplementing his opposition Briefs with additional evidence to support his breach of duty of fair representation claim.

More importantly, the "lack of an opportunity to complete discovery" was the very argument that the plaintiffs—who were represented by the same attorney representing Plaintiff here—unsuccessfully ar-

gued in an attempt to withstand entry of summary judgment in *Pippin v. United States Postal Service,* No. 90–855, 1991 WL 36542 (Mar. 15, 1991 Opinion) (D.Colo. 1991). Both Plaintiff and the Defendants have, independently, submitted a copy of the decision in that case. And, the Court finds Judge Arraj's ruling on the "lack of discovery" issue particularly well-reasoned.

*Pippin* involved the very same issues, the very same contract, the very same defendants, and the very same arbitration ruling at issue in this case. As in this case, the NRLCA and the Postal Service moved for summary judgment. From the Court's review of the *Pippin* decision, it appears that the parties in that case made *the very same arguments* in support of and in opposition to the NRLCA's and the USPS's motions as Plaintiff Kaiser and the Defendants here have made. It was the NRLCA's and Postal Service's motions for summary judgment that Judge Arraj decided in his March 1991 Opinion.

After rejecting the union's *res judicata* and statute of limitations arguments—as this Court has done—Judge Arraj went on to examine the merits of Plaintiff's breach of contract/DFR claims. Finding—like this Court has found—that based upon the evidence in that case, there was no legal merit to Plaintiff's DFR claims, Judge Arraj considered and rejected Plaintiff's lack of discovery argument as irrelevant:

The plaintiffs argue that summary judgment is inappropriate on this [duty of fair representation] issue because they have not had an opportunity to complete enough discovery to demonstrate that the defendants' conduct was discriminatory, unreasonable, and in bad faith. The Sixth Circuit has noted, however, that

In the context of the hybrid 301 action, absent a finding that an erroneous arbitral decision has been reached, the inquiry into the union's failure to comply with the duty of fair representation becomes immaterial, and is not justiciable. Thus, the ultimate issue with respect to the claim against the union in any hybrid 301 case is whether the

alleged breach of the duty of fair representation 'contributed to the arbitrator's making an *erroneous* decision'. *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 560 (6th Cir.1990) (citations omitted). *See also Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976) (when the union actually uses the grievance and arbitration processes on behalf of the employee, the focus is no longer on the union's failure to act, but on whether contrary to the arbitrator's decision, the employer breached the contract).

Consequently, if the plaintiffs cannot show [that] an erroneous arbitral decision has been made, it is irrelevant that the plaintiffs have not had enough opportunity for discovery on the issue of the union's fair representation....

[J]udicial review of a grievance/arbitration award is limited to determining whether the award draws its essence from the collective bargaining agreement. *Sterling Colorado Beef Co. v. United Food and Commercial Workers*, 767 F.2d 718, 720 (10th Cir.1985).... The courts will not interfere with the arbitrator's decision unless the contract is positively not open to the arbitrator's interpretation. *Id.*

\* \* \* \* \* \*

The plaintiffs argue that Arbitrator Zumas erroneously concluded that as a matter of law there was no enforceable estoppel against the postal service, despite the undisputed fact that prior to the plaintiffs' transferring to rural carrier positions they were assured by Postal Service management that their pay would not be decreased. The plaintiffs also contend that they are not trying to relitigate the Zumas award, but rather argue that the award is narrowly couched in that it does not consider the issue of the basic application of Step B.

The Zumas award gives lengthy consideration to the estoppel argument and concluded that the elements of estoppel were not satisfied because the postmasters or supervisors who made the decision did not have the authority to make

the statements concerning pay scales, and considering the "abundance of information" distributed to the postal service employees concerning the Volz decision, the grievants knew or should have known that when transferring to the rural carrier craft they would be required to start at salary level Step B. The plaintiffs are correct in their assertion that the United States Supreme Court in *Office of Personnel Management v. Richmond*, 496 U.S. 414, ——, 110 S.Ct. 2465, 2471, 110 L.Ed.2d 387 (1990), did *not* hold that estoppel can never lie against the government.... The fact that *Richmond* left open the possibility that an estoppel argument could be made against the government in some case, however, does not mean that the Zumas award should be overturned. *See, United States Paperworks Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (even where arbitrator has made a mistake, his award cannot be overturned if he is arguably construing the contract or acting within his authority).

\* \* \* \* \* \*

The plaintiffs claim that the "underlying scheme" was ignored in the Zumas award in that it did not address the applicability of Step B. The NRLCA did not argue at the arbitration that the contract had been misinterpreted, but rather it contended that the employees who had relied upon the misrepresentations of the Postal Service should be allowed to pursue their remedies with regional arbitrators. Arbitrator Zumas, however, concluded:

> The Agreement is clear on its fact as to the salary for employees entering the Regular Rural Carrier positions who are not substitute Rural carriers. The "non-substitute Rural carriers" are "new regular carrier appointees" whether they are entering the Postal Service employment or transferring from another craft. As "new" regular carriers, the employees were to receive compensation at salary level Step B. This system was plainly understood by

more than 2,000 employees, many of whom transferred from another craft and have never alleged to have expected to receive compensation at their prior attained salary level. . . .

Therefore, if this court were to find the interpretation of the contract was erroneous, it would be in direct conflict with arbitrator Zumas' conclusion that it is plain from the face of the contract that the plaintiffs should have been transferred to positions as rural carriers at Step B. The court may not " . . . interfere with an arbitrator's decision unless it can be said with positive assurance that the contract is not susceptible to the arbitrator's interpretation." *Sterling Colo. Beef v. United Food & Com. Workers,* 767 F.2d at 720. . . .

The court appreciates the difficult positions of the plaintiffs, but the Zumas award is a carefully considered judgment within the express terms of the contract. The Supreme Court has stated, "it is the arbitrator's construction which is bargained for, and so far, as the arbitrator's decision concerns the construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). Consequently the arbitration award should be upheld.

*Pippin,* Mar. 15, 1991 Opinion, pp. 14–18.

This Court agrees with Judge Arraj's interpretation of the Zumas award in *Pippin* and his determination that, because the award "draws its essence from the collective bargaining agreement" and is not "an erroneous decision", Plaintiff Kaiser's argument—like the *Pippin* plaintiffs' argument—for more discovery is irrelevant.

For all of these reasons, the Court finds that Plaintiff has failed to make out a legally sufficient hybrid Section 1208(b) claim of breach of contract/breach of duty of fair representation.

Furthermore, to the extent that Plaintiff has alleged a separate count of "equitable estoppel", as indicated above, this issue was ruled upon by Arbitrator Zumas, and this Court has concluded that his ruling was not erroneous. Article 15.5.A of the NRLCA/USPS collective bargaining agreement expressly provides *"The [National] arbitrator's determination shall be final and binding."*

For these reasons, Plaintiff's "Second Claim" for relief will be dismissed.

## IV. CONCLUSION

For all of the foregoing reasons, and the Court being otherwise fully advised in the premises,

IT IS HEREBY ORDERED that the Defendants' Motions for Summary Judgment be, and hereby are, GRANTED. Accordingly, this action will be DISMISSED, in its entirety, with prejudice.

Let Judgment be entered accordingly.