Barbara A. WATSON, Plaintiff,

v.

RIVERSIDE OSTEOPATHIC HOSPITAL and Service Employees International Union Local 79 of the AFL—CIO, Defendants.

No. 99–70189.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 22, 1999.

Charles W. Palmer, Taylor, MI, for Plaintiff.

Renate Klass, Southfield, MI, Elizabeth M. Pezzetti, Bloomfield Hills, MI, H. Elliot Parnes, Southfield, MI, for Defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

## I. INTRODUCTION

Plaintiff Barbara A. Watson, a registered nurse, commenced this suit on January 19, 1999 against her former employer, Defendant Riverside Osteopathic Hospital ("Riverside") and her former bargaining representative, Defendant Service Employees International Union Local 79 of the AFL—CIO ("Local 79"), asserting hybrid breach-of-contract and duty of fair representation claims under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). In her Complaint, Plaintiff alleges that Riverside discharged her without just cause in violation of its collective bargaining agreement ("CBA") with Local 79, and that Local 79 breached its duty of fair representation by failing to timely seek arbitration of Plain-

tiff's grievance. The Court's subject matter jurisdiction is founded upon federal questions arising under the LMRA.

By motions filed on September 30, 1999, Defendants Riverside and Local 79 now seek summary judgment in their favor on both of Plaintiff's claims. Defendants argue that Local 79 has provided an adequate explanation for its failure to timely seek arbitration of Plaintiff's grievance. In addition, Defendants contend that Plaintiff was properly discharged for cause under the CBA and the "Standards of Conduct" promulgated by Riverside, after she was found sleeping or "assuming the position of sleep" on her job as a nurse supervisor. Plaintiff filed a joint response to these two motions on October 20, 1999, and Defendants each filed a reply brief in further support of their motions on October 29, 1999.[1]

The Court held a hearing on Defendants' motions on December 16, 1999. Having reviewed the briefs and supporting materials submitted by the parties, and having considered the arguments of counsel at the December 16 hearing, the Court is now prepared to rule on these motions. For the reasons set forth in this Opinion and Order, the Court finds that Defendants are entitled to summary judgment in their favor.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiff's Discharge by Defendant Riverside Osteopathic Hospital

Plaintiff Barbara Watson was employed at Defendant Riverside Osteopathic Hospital in Trenton, Michigan from 1990 until February 3, 1997, when she was discharged for allegedly sleeping or "assuming the position of sleep" on the job in violation of "Standards of Conduct" issued by Riverside. At the time of her dis-

1. Defendant Riverside also has brought a separate motion for partial summary judgment on the issue of damages, to which Plaintiff has not responded. Because of the disposition of Defendants' other motions, the Court need not address this additional motion.

charge, Plaintiff was working the midnight shift as a charge nurse in Riverside's mental health unit. Her employment at Riverside was governed by a CBA between Riverside and Plaintiff's bargaining representative, Defendant Service Employees International Union Local 79 of the AFL—CIO.

On January 30, 1997, the night of the incident which led to her discharge, Plaintiff was the only registered nurse on her floor and, as the charge nurse, was responsible for the safety of all of the patients and staff on that floor. At her deposition, Plaintiff described some of the patients in the unit as combative, but could not recall whether any were suicidal. (Plaintiff's Dep. at 97.) During her shift that night, Plaintiff entered a conference room, propped her feet up on a chair, tilted her head back, and closed her eyes.[2] She was discovered in this position by her supervisor, Kathy Potesta, the patient care director for Riverside's mental health unit, who roused Plaintiff by saying, "Barbara, you need to wake up." (*Id.* at 98.)

Following this incident, Plaintiff was suspended pending further investigation. On February 3, 1997, Riverside discharged Plaintiff, citing her alleged violation of Rule 38 of Riverside's "Standards of Conduct for Employees," which lists "[s]leeping or assuming posture or position of sleeping during working hours" as an example of "unacceptable behavior." (Riverside's Motion, Ex. 4, ¶ 38.)

## B. Riverside's Policies and Prior Warnings Regarding Sleeping on the Job

Under its CBA with Local 79, Riverside retains the right "to promulgate from time to time, and to enforce, reasonable rules and regulations which it considers necessary or advisable for the safe, effective and efficient operation of the Hospital, so long as they are not inconsistent" with the terms of the CBA. (Riverside's Motion, Ex. 6, CBA Article III, § 3.) This portion of

the CBA further provides that "[a]ny nurse who violates or fails to comply [with these rules and regulations] shall be subject to discipline or discharge subject to the grievance procedure." (*Id.*) In Article IX, entitled "Discipline or Discharge," the CBA provides that "[n]urses covered by this Agreement shall not be disciplined or discharged without just cause," and that "[d]isciplinary action will be on a corrective progressive basis, utilizing verbal warnings, then written warning followed by disciplinary suspensions, . . . followed by discharge, if necessary." (*Id.*, Article IX, § 1.) This same section, however, states that "[t]he Hospital and the Union recognize . . . that there are some offenses which, by their nature, may justify discharge or discipline in the first instance without any prior warnings." (*Id.*)

Pursuant to its authority under the CBA, Riverside issued its "Standards of Conduct for Employees," which lists forty examples of "unacceptable behavior." (Riverside's Motion, Ex. 4.) As noted earlier, one such example is "[s]leeping or assuming posture or position of sleeping during working hours." (*Id.*, ¶ 38.) The preamble to these Standards states that "[i]t is the established policy of this Hospital that any conduct, which, in its opinion, interferes with or adversely affects employment is sufficient grounds for disciplinary action ranging from oral or written warnings to suspension or immediate dismissal," and that "[n]otwithstanding anything to the contrary, progressive discipline is not required." (*Id.* at 1.) This introductory section also lists "[f]actors that may be considered in ascertaining the appropriate disciplinary action," including (i) "[s]eriousness of conduct," (ii) "[e]mployment record," (iii) "[e]mployee's ability to correct conduct," (iv) "[a]ction taken with respect to similar conduct by other employees," (v) "[e]ffect on patients and/or visitors," and (vi) "[s]urrounding circumstances." (*Id.*) Plaintiff testified at her

---

**2.** While admitting this conduct at her deposition, Plaintiff denied that she was sleeping or

that she had assumed the position of sleeping. (*Id.* at 97–99.)

deposition that she was given a copy of these Standards, had reviewed them, and had signed a document acknowledging that she had received them. (Plaintiff's Dep. at 77–78.)

On May 7, 1992, Plaintiff and her supervisor, Kathy Potesta, discussed the prohibition against sleeping on duty, as well as other matters relating to scheduling and breaks during the midnight shift. (Potesta Dep. at 14–15.) Later that day, Potesta issued a memorandum to Plaintiff reviewing the points addressed in their discussion, including that "[s]leeping while on duty is not allowed and disciplinary action, up to, and including termination will result in the event that this occurs." (Local 79's Motion, Ex. B.)

A few months later, in September of 1992, Potesta issued a written reprimand to Plaintiff, which stated:

On September 21, 1992, employee [i.e., Plaintiff] failed to fulfill the responsibilities of a charge nurse by failing to follow a directive given to her on May 12, 1992 stating that:

1. Employees are not allowed to sleep during their unpaid break period in patient care areas.

2. Employees can not utilize hospital supplies (ie. blankets and pillows) to sleep.

3. Employees are responsible for ending their unpaid break period at the appropriate time without assistance of other hospital personnel to wake them up.

Any further occur[r]ences of this nature will result in further disciplinary action, up to and including termination.

(Local 79's Motion, Ex. C.) Potesta testified at her deposition that this reprimand resulted from an incident involving a health care worker, Melissa Kalo, who Potesta discovered sleeping in the mental health unit during the midnight shift. (Potesta Dep. at 13–14.) Because Plaintiff was the charge nurse on duty that night, she was written up for failing to adequately supervise an employee under her charge. (Id. at 14.)[3]

On October 17, 1995, following another incident where a health care worker, Scott Hall, was found sleeping in the mental health unit,[4] Potesta issued another memorandum addressing the subject of sleeping on the job:

It has come to my attention that it is a practice on the midnight shift that staff are allowed to take their "breaks" in the offices and sleeping is allowed during that time. So that there is no misunderstanding of the policy on this unit, SLEEPING IS PROHIBITED. Disciplinary action will be taken against anyone found to be sleeping on this unit, up to, and including termination. All staff are expected to initial that they have read this memo.

(Local 79's Motion, Ex. D.) Plaintiff initialed this memorandum, and also attended a meeting on October 19, 1995, at which the subject of sleeping on the job was discussed and the employees were again reminded that such conduct was prohibited. (Plaintiff's Dep. at 79–82; see also Local 79's Motion, Ex. E, Minutes of 10/19/95 Meeting.)[5]

---

**3.** Kalo was given a written warning for sleeping on duty. (Id.)

**4.** Plaintiff was not on duty on the night of this incident. Potesta testified that Hall was given a three-day suspension for this violation. (Id. at 27.)

**5.** Apart from these incidents, Defendants cite Plaintiff's admissions at her deposition that, prior to the January 30, 1997 incident, she had in fact slept in the mental health unit at

Riverside during work hours, had assumed the position of sleeping during work hours, and had allowed other employees to sleep or assume the position of sleeping during work hours. (Plaintiff's Dep. at 91.) She further admitted to sleeping, or assuming the position of sleeping, at a variety of locations within the unit, including the medication room, the conference room, the supply room, the kitchen, the hallway, the social worker's office, and the nursing station. (Id. at 91–96.) She testified that the longest such sleep period was

## C. Plaintiff's Grievance over Her Discharge

Following her discharge on February 3, 1997, stemming from the January 30, 1997 incident, Plaintiff challenged Riverside's action through the five-step grievance process set forth in her employer's CBA with Local 79. (Riverside's Motion, Ex. 6, CBA at 7–8.) On February 5, 1997, Local 79 presented Plaintiff's grievance to Riverside in accordance with Step 3 of this procedure. On February 25, 1997, Riverside denied the grievance, and Local 79 responded by appealing this decision under Step 4. Riverside issued its Step 4 answer on May 13, 1997, denying the union's request to reduce Plaintiff's discharge to a three-day suspension, and finding that this discharge did not violate the CBA.

Under the CBA, Riverside's Step 4 answer triggered a 30–day deadline for Local 79 to request that the grievance be submitted to arbitration. On June 13, 1997, the day this deadline was set to expire, Riverside granted Local 79 an extension until June 30, 1997 to decide whether to seek arbitration. (Local 79's Motion, Ex. H.) On June 23, 1997, Local 79 sought an additional extension, and Riverside responded on June 30, 1997, granting an extension until July 31, 1997. (Local 79's Motion, Ex. I.)

In the meantime, Local 79 performed an internal evaluation of Plaintiff's grievance, and notified her on June 23, 1997 that the grievance lacked sufficient merit to warrant arbitration. Following Plaintiff's appeal of this decision within the union, however, Local 79 reconsidered its position and granted her appeal on August 7, 1997.[6]

While this internal appeal was pending, Local 79 allegedly sent a letter to River-

"[p]robably five and a half hours," and that it was "sometimes the case" that she would take a break from 1:00 a.m. to 4:00 a.m. (*Id.* at 92, 160.) Moreover, Plaintiff conceded that she had devised a system that permitted the employees under her supervision to take four-hour breaks. (*Id.* at 92.) Finally, Riverside points to a request for admission—a request deemed admitted, by virtue of Plaintiff's apparent failure to respond within 30 days, *see* Fed.R.Civ.P. 36(a)—charging that Plaintiff "requested that staff members alert [her] by walkie-talkie if anyone entered the mental health unit while [she] was sleeping on [her] shift, so that [she] wouldn't be found sleeping or assuming the position of sleep." (Riverside's Reply Br., Ex. 5, Request No. 1.)

One of the health care workers who Plaintiff occasionally supervised, Scott Hall, also has testified regarding Plaintiff's sleeping on the job in Riverside's mental health unit. At his deposition, Hall stated that Plaintiff "hibernated like a bear," "slept every possible second, and was an artist at sleeping." (Hall Dep. at 7.) Hall further testified that Plaintiff used walkie-talkies to cover her sleeping. (*Id.*) Finally, he testified:

[Plaintiff] would get a big coat like almost like a parka-type thing, and most of the time she would go into the med room, and lay down on the examination table, but she would often lie behind like a door. She would open it, and come in here, and lie right behind the door, that way if you would open the door you would hit her, and she would go, she would go anywhere. She would go in the supply room. She would disappear, and you wouldn't know where she was, and you'd open a door, and you'd hit Barb, you know.

(*Id.* at 9.)

Plaintiff's admitted tendency to sleep on the job apparently is attributable, at least in part, to the fact that she held two other jobs while employed at Riverside: a full-time registered nurse position at St. Vincent Hospital in Toledo, Ohio, where she worked from 8:30 a.m. to 5:00 p.m., and a position with IHS Home Health Care, which involved visiting patients at their homes, some as far as 40 miles southeast of Toledo. (Plaintiff's Dep. at 108–10.) On days when she worked at both St. Vincent and Riverside, she estimated that she would get "[p]robably two and a half to three hours" of sleep. (*Id.* at 116.)

Defendants apparently were unaware of most or all of this at the time Plaintiff was discharged in February of 1997. Thus, the above information presumably played no part in Riverside's decision to discharge Plaintiff or Local 79's action on Plaintiff's grievance.

6. In an affidavit in support of Local 79's motion, the union's counsel now states that, had the information disclosed in Plaintiff's deposition been known to Local 79 at the time Plaintiff's grievance was pending, "Local 79 would have declined to proceed and would not have appealed the matter to arbitration." (Rita Smith Aff. at ¶ 4.)

side on July 21, 1997 by certified mail, requesting that the grievance be submitted to arbitration pursuant to Step 5 of the CBA. While Plaintiff testified that she received a copy of this letter, (Plaintiff's Dep. at 142, 146–47), Riverside has denied ever receiving it, and Local 79 has been unable to produce any evidence—e.g., the green postal card evidencing receipt, or the letter itself marked undelivered by the post office—that the union sent or Riverside received this July 21 letter. Thus, when Local 79 subsequently issued a formal "Demand for Arbitration" on August 8, 1997, (Local 79's Motion, Ex. K), Riverside responded in a August 13, 1997 letter that it would "raise an arbitrability defense as the Union failed to timely file its demand for arbitration" on or before the July 31, 1997 deadline. (Local 79's Motion, Ex. L.)

The matter then went to arbitration on May 18, 1998. As promised, Riverside asserted at the arbitration hearing that it had never received Local 79's July 21, 1997 letter requesting arbitration, and that the union's request therefore was untimely. In response, Local 79's staff attorney, Yasmin Abdul–Karim, who was responsible for overseeing the union's arbitration demands, testified that the July 21 request was prepared and mailed at her direction in the normal course of business. In a July 29, 1998 opinion and award, the arbitrator found that Local 79's demand for arbitration was untimely and that the matter was not arbitrable, citing the absence of "any evidence that the July 21, 1997 letter was either sent or received." (Riverside's Motion, Ex. 12, Arbitrator Op. at 7.)

### D. Procedural Background

Plaintiff brought this hybrid breach-of-contract and duty of fair representation suit on January 19, 1999, asserting claims against both Riverside and Local 79 under § 301 of the LMRA, 29 U.S.C. § 185(a). In Count I of her Complaint, Plaintiff alleges that her discharge by Riverside violated the terms of the CBA governing her employment, which allegedly provided that she "could not be terminated without good or just cause." (Complaint at ¶ 16.) She alleges that she "was not guilty of sleeping on the job on the date alleged by" Riverside, and that Riverside accordingly lacked "good or just cause to terminate Plaintiff's employment." (Id. at ¶¶ 17–18.) In Count II, Plaintiff alleges that Local 79's failure to timely seek arbitration of Plaintiff's grievance violated the duty of fair representation it owed as Plaintiff's bargaining representative.

By motions filed on September 30, 1999, the two Defendants separately seek summary judgment in their favor on Plaintiff's claims against them. In support of their motions, Defendants acknowledge that Local 79 failed to ensure that its request for arbitration was timely received by Riverside before the July 31, 1997 deadline, but argue that the union has nonetheless provided a sufficiently reasonable explanation for its actions to satisfy its duty of fair representation. Defendants further contend that Riverside's discharge of Plaintiff did not violate the CBA. Plaintiff responded to these motions on October 20, 1999, and Defendants filed reply briefs on October 29, 1999.

On December 16, 1999, the Court held a hearing on Defendants' motions. For the reasons set forth below, the Court finds that issues of fact remain as to whether Local 79 has adequately explained its failure to timely seek arbitration, but that Riverside's discharge of Plaintiff did not violate the CBA. Accordingly, because this latter showing is required under Plaintiff's claims against both Riverside and Local 79, both Defendants are entitled to summary judgment in their favor.

### III. *ANALYSIS*

### A. The Standards Governing Defendants' Motions

In their present motions, Defendants seek summary judgment in their favor on Plaintiff's breach-of-contract and duty of

fair representation claims. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[7] The *Celotex* Court explained:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these principles in considering Defendants' motions.

## B. The Standards Governing Hybrid Breach–of–Contract and Duty of Fair Representation Claims under the LMRA.

■ A hybrid suit brought under § 301 of the LMRA "implicates the interrelationship among a union member, his union, and his employer." *Vencl v. International Union of Operating Eng'rs, Local 18*, 137 F.3d 420, 424 (6th Cir.1998). To prevail against her union, Plaintiff must prove "both (1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair

---

**7.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

representation." 137 F.3d at 424. The Sixth Circuit has further explained:

> If the union member fails to prove that the union breached its duty, he will, obviously, recover nothing from the union. If the union member fails to prove that the employer breached the collective bargaining agreement, he also will recover nothing, because the union member's grievance would have failed regardless of the union's representation.

137 F.3d at 424.

Likewise, this same two-prong test governs Plaintiff's claim against her employer. *Roeder v. American Postal Workers Union, AFL—CIO,* 180 F.3d 733, 737 (6th Cir.1999). No liability attaches to either Riverside or Local 79 unless both elements of this test are satisfied. 180 F.3d at 737; *see also Kaiser v. United States Postal Service,* 785 F.Supp. 648, 658–59 (E.D.Mich.1992) (discussing the interdependency of an employee's § 301 claims against his employer and his union).

## C. Issues of Fact Remain as to Whether Local 79 Breached Its Duty of Fair Representation Owed to Plaintiff.

■ To determine whether Local 79 breached its duty of fair representation in this case, the Court must consider "whether the Union's conduct in representing [Plaintiff] was arbitrary, discriminatory, or in bad faith." *Roeder,* 180 F.3d at 737. The Sixth Circuit has cautioned that "[m]ere negligence on the part of a union does not satisfy this requirement." 180 F.3d at 737. Rather, "[f]or liability to attach, a union's conduct must be 'so far outside a wide range of reasonableness as to be irrational.'" 180 F.3d at 737 (citation omitted).

■ In this case, Local 79's liability hinges upon its failure to ensure that its request for arbitration of Plaintiff's grievance was timely made before the twice-extended deadline of July 31, 1997. Because the union's request was untimely, the arbitrator never reached the merits of Plaintiff's grievance. On its face, then, Local 79's representation of Plaintiff seems plainly inadequate. Yet, when considered in light of the fair representation standards quoted above, it might appear that Local 79's failure was attributable to the "mere negligence" of missing a deadline, and therefore would not constitute a breach of duty. Thus, the general standards as set forth in the case law do not seem particularly helpful when applied to the present circumstances.

Fortunately, the Sixth Circuit's decisions in *Ruzicka v. General Motors Corp.,* 523 F.2d 306 (6th Cir.1975) ("*Ruzicka I*"), and *Ruzicka v. General Motors Corp.,* 649 F.2d 1207 (6th Cir.1981) ("*Ruzicka II*"), provide a specific analytical framework for deciding cases like this one, involving missed deadlines or union neglect in grievance processing. In those cases, as here, the union, Local 166, sought and received two extensions to the deadline for filing a necessary "statement of unadjusted grievance" with the employer, GM, but nevertheless failed to file the statement. As a result, the plaintiff employee, like Plaintiff here, was denied the opportunity to prosecute his grievance before an arbitrator.

In *Ruzicka I,* the plaintiff appealed the District Court's determination that the union's mere "neglect" to file the statement did not violate its duty of fair representation, absent an additional showing that the union had acted in bad faith. The Sixth Circuit reversed and remanded, finding that the duty of fair representation is not "so limited":

> We believe that the District Court misread [the Supreme Court's decision in *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) ] when it held that "bad faith" must be read into the separate and independent standards of "arbitrary" or "discriminatory" treatment. Union action which is arbitrary or discriminatory need not be motivated by bad faith to amount to unfair representation.

In the instant case Local 166 officials discussed Appellant's grievance among themselves and with GM personnel, but inexplicably neglected to take Appellant's grievance to the third stage of processing by not filing a Statement of Unadjusted Grievance with the appropriate GM official. Having sought and been granted two extensions of time to file the Statement and at no time having decided that Appellant's claim was without merit, the Local allowed the final deadline to pass without filing the Statement or requesting a further extension. At this point the Local did not inform either Appellant or GM that it had decided either to continue or to stop processing Appellant's grievance. Such negligent handling of the grievance, unrelated as it was to the merits of Appellant's case, amounts to unfair representation. It is a clear example of arbitrary and perfunctory handling of a grievance.

*Ruzicka I,* 523 F.2d at 310. In a subsequent order denying a petition for rehearing, the Court emphasized that "[o]ur opinion i[n] this action speaks to a narrow range of cases in which unexplained union inaction, amounting to arbitrary treatment, has barred an employee from access to an established union-management apparatus for resolving grievances." *Ruzicka v. General Motors Corp.,* 528 F.2d 912, 913 (6th Cir.1975).

On remand, the District Court referred the matter to arbitration for a decision on the merits of the plaintiff's wrongful discharge claim, while retaining jurisdiction to resolve any outstanding issues. The arbitrator found that the harsh penalty of discharge was not justified under the CBA, and ordered the plaintiff reinstated with back pay. The District Court denied the plaintiff's motion for summary judgment based on this arbitral decision, and instead ordered that the claims against GM and the union should proceed to trial. At the close of proofs, the trial court found as a matter of law that the union's negligent failure to timely seek arbitration amounted

to unfair representation, and also rendered a judgment against GM based solely on the arbitrator's determination.

All three parties appealed to the Sixth Circuit. In support of its appeal, the union argued that the District Court had improperly construed the decision in *Ruzicka I* as foreclosing any consideration of evidence explaining the union's failure to timely file the necessary statement. In particular, the union pointed to evidence that its officials had relied on a "prevailing practice of freely granting extensions of time for the exchange of grievance statements," and argued that this reliance should excuse its failure to submit the statement on time. The Sixth Circuit agreed, holding that remand was necessary so that the lower court could consider the union's proffered explanation for its inaction:

If the district court concludes that the bargaining representative's failure to timely file the grievance statement was due to reliance on the prevailing practice of freely granted extensions, that will be sufficient to relieve the union from liability. Such conduct does not amount to the arbitrariness which *Ruzicka I* held will constitute a breach of the duty of fair representation. Nor does it amount to the perfunctory calculation of a "non-grievance".... Concomitantly, it does not equal the inept handling of a grievance by a union ignorant of the contract provisions relevant to the case.... In relying on a past practice, a union's omission is based on a wholly relevant consideration, is not intended to harm its member, and is not the type of arbitrariness which reflects reckless disregard for the rights of the individual employee. Such conduct, at times, manifests no more than ordinary negligence and we cannot hold a union liable for breach of the duty of fair representation based upon simple negligence.... Of course, when a bargaining representative acts arbitrarily in failing to process a grievance submitted to it by an em-

ployee without a sound reason for its decision, i.e. without reliance on a prevailing practice, our holding in *Ruzicka I* will render the union liable for unfair representation.

*Ruzicka II*, 649 F.2d at 1211–12 (footnotes and citations omitted).

Returning to the present case, both sides argue that the principles announced in *Ruzicka I* and *Ruzicka II* militate in their favor. Defendants point to the testimony of the union staff attorney, Yasmin Abdul–Karim, that she directed that the July 21, 1997 request for arbitration be sent to Riverside by certified mail in accordance with Local 79's standard practice. Defendants contend that this testimony adequately explains any failure to timely request arbitration, and that Plaintiff has produced no evidence challenging this explanation. Plaintiff, in turn, notes the absence of direct evidence that the July 21 letter was ever sent to Riverside, and asserts that the union's proffered explanation is not of the sort deemed sufficient in *Ruzicka II* to preclude union liability. At this stage of the proceedings, the Court finds that Plaintiff has the better argument.

Defendants' appeal to *Ruzicka II* rests upon the premise that Abdul–Karim's reliance upon standard union practice in directing that the July 21 letter be sent is akin to the union's reliance in *Ruzicka II* on the parties' past practice of freely granting extensions. Defendants then argue that Abdul–Karim's claimed reliance is unrefuted in the evidentiary record, noting that Plaintiff has produced no evidence tending to cast doubt on Local 79's claim that the July 21 letter was indeed sent to Riverside, though apparently not received.

The Court finds Defendants' proposed analogy between this case and *Ruzicka II* unpersuasive. First, the Court declines to impose upon Plaintiff the impossible burden of disproving Abdul–Karim's testimony that she directed that the July 21 letter be sent to Riverside. It is not at all clear what sort of evidence Plaintiff could produce to satisfy such a burden, short of securing Abdul–Karim's retraction of her testimony.

More importantly, Defendants' argument, if accepted, would discharge a union's liability for a missed deadline in all cases where the union is able to offer the testimony of an official stating that she initiated the processing of a grievance in accordance with standard practice, and then reasonably assumed that the process would continue to completion. Even accepting Abdul–Karim's testimony as true, it establishes nothing more than that she directed her clerical staff at Local 79 to send an arbitration request to Riverside.[8] If this direction was not carried out, this neglect of a crucial obligation must be charged to the union, even if the official in charge might have reasonably assumed that the request for arbitration would be sent in accordance with customary internal procedures, and even if the clerical staff had never before failed to carry out such an instruction. Simply put, an internal union breakdown in grievance processing is not the same as the union's reliance in *Ruzicka II* on a past practice of grievance handling as between the union and the employer.

Moreover, as for Plaintiff's purported failure to produce affirmative evidence of Local 79's perfunctory and arbitrary handling of her grievance, the Court notes that the act of mailing a letter typically is susceptible to a variety of forms of proof, and that Local 79 has offered no such proof here. In light of the union's customary practice of sending such requests for arbitration by certified mail, one would expect to see *some* evidence that the letter either did or did not reach its intended destination—*e.g.*, the return card from the postal service, or the letter itself returned as undelivered. The absence of any such

8. The clerk who would have handled this matter, Esther Acuna Valdez, is no longer employed by Local 79, and did not testify at the arbitration hearing.

evidence is telling proof in its own right, and surely permits the inference that the July 21 letter in fact was not sent to Riverside. Indeed, the arbitrator so concluded, and the Court certainly sees no basis in the present record for determining otherwise.

Accordingly, the Court finds that issues of fact remain as to whether Local 79's failure to timely request arbitration can be satisfactorily explained in accordance with the standards set forth in *Ruzicka II,* or whether the union instead is guilty of "unexplained inaction" of the sort discussed in *Ruzicka I.See also Vencl, supra,* 137 F.3d at 426 (rejecting as "not a reasonable excuse" a union's claim that "it filed late only because its business representative had gone on vacation"). Because the Court cannot say as a matter of law that the union fairly represented Plaintiff in the grievance proceedings, Defendants are not entitled to summary judgment on this basis.

### D. Riverside Did Not Breach the CBA by Discharging Plaintiff for Sleeping on the Job.

Having addressed the duty of fair representation prong of the two-part test for hybrid § 301 claims, the Court next turns to the breach-of-contract element of this test. More specifically, to determine whether Riverside's discharge of Plaintiff breached the CBA, the Court must "look to the plain meaning of the agreement." *Roeder,* 180 F.3d at 737. Upon reviewing the CBA and the relevant portions of the evidentiary record, the Court concludes that Riverside's action fully comported with the CBA, and that Plaintiff has failed to identify a genuine issue of fact as to whether her discharge violated the letter or spirit of the CBA.

■ As an initial matter, the Court observes that two underlying issues are readily resolved as a matter of law under the present evidentiary record. First, although Plaintiff contends that she has raised a question of fact by virtue of her denial at her deposition that she was sleeping or had assumed the position of sleep when discovered by her supervisor in a conference room on the night of January 30, 1997, the Court rejects Plaintiff's attempt to draw a conclusion that is flatly at odds with her underlying testimony about the events of that day. Specifically, Plaintiff admitted at her deposition that she entered the conference room that night, sat down in a chair with her back to the door, propped her feet up on another chair, tilted her head back, and closed her eyes. (Plaintiff's Dep. at 97–98.) She further testified that she remained in this position until her supervisor, Kathy Potesta, entered the room and said, "Barbara, you need to wake up." (*Id.* at 98.) In light of these express admissions, the Court cannot accept Plaintiff's subsequent assertion that this conduct somehow did not constitute "assuming the position of sleeping."

Next, the Court readily concludes that Riverside had the authority under the CBA to discharge Plaintiff for sleeping on the job. As noted earlier, the CBA expressly confers upon Riverside the authority to issue and enforce "reasonable rules and regulations which it considers necessary or advisable for the safe, effective and efficient operation of the Hospital," and permits Riverside to "discipline or discharge" any nurse who violates those rules, subject to the CBA's grievance procedure. (Riverside's Motion, Ex. 6, CBA Article III, § 3.) The CBA elsewhere states that "[t]he Hospital and the Union recognize ... that there are some offenses which, by their nature, may justify discharge or discipline in the first instance without any prior warnings." (*Id.*) Finally, the "Standards of Conduct for Employees" document issued by Riverside in accordance with the CBA expressly cites "[s]leeping or assuming posture or position of sleeping during working hours" as an example of unacceptable conduct, and further provides that "[i]t is the established policy of this Hospital that any conduct,

which, in its opinion, interferes with or adversely affects employment is sufficient grounds for disciplinary action ranging from oral or written warnings to suspension or immediate dismissal," and that "[n]otwithstanding anything to the contrary, progressive discipline is not required." (Riverside's Motion, Ex. 4, at 1 & ¶ 38.) Given all this, it is clear that Riverside has the authority, at least under some circumstances, to discharge an employee for sleeping on the job.

■■■ This leaves only the question whether Riverside's specific decision to discharge Plaintiff was unduly harsh, arbitrary, or inconsistent with its prior practice of employee discipline. Plaintiff notes that the "Standards of Conduct" document promulgated to Riverside's employees includes a list of six factors Riverside may consider in determining an appropriate disciplinary action, including (i) "[s]eriousness of conduct," (ii) "[e]mployment record," (iii) "[e]mployee's ability to correct conduct," (iv) "[a]ction taken with respect to similar conduct by other employees," (v) "[e]ffect on patients and/or visitors," and (vi) "[s]urrounding circumstances." (Riverside's Motion, Ex. 4, at 1.) Upon analyzing each of these factors, Plaintiff contends that they fail to support Riverside's decision to terminate her for sleeping on the job. The Court cannot agree.[9]

First, with regard to the severity of the violation, Plaintiff acknowledges that "certainly the charge of sleeping on the job is serious," but nevertheless contends that the alleged infraction here was not so serious, where the statement of a co-worker indicates that Plaintiff was in the conference room for only ten minutes before Kathy Potesta found her, and where "there was no evidence that her alleged sleeping caused any actual detriment to the hospital operation." (Plaintiff's Response at 8.) Yet, in assessing the severity

9. As a preliminary matter, Riverside argues that its discretion under the CBA and the "Standards of Conduct" to determine the appropriate punishment for sleeping on the job should bring this Court's inquiry to an end, without the need to consider whether discharge was the appropriate penalty in light of the six factors listed in the "Standards of Conduct." The cases cited by Riverside, however, do not establish this proposition. First, in *Armstrong v. Chrysler Corp.*, 972 F.Supp. 1085, 1091 (E.D.Mich.1997), the Court did not rely on the employer's discretionary power under a CBA to set the appropriate punishment, but instead pointed to "Chrysler's policy to discharge employees for fighting in an effort to keep its workplace safe." Next, although *Hatfield v. Johnson Controls, Inc.*, 791 F.Supp. 1243, 1250–53 (E.D.Mich.1992), arguably lends some support to Riverside's position, that case was decided under Michigan law, and thus its holding does not extend to cases governed by the LMRA and its corresponding federal common law. Further, the Court's own research has failed to identify any cases expressly holding that an employer's discretion under a CBA to determine the appropriate disciplinary action precludes any particularized judicial inquiry into the penalty imposed in a given case. *But see White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 558 (6th Cir.1990) (finding no breach of a CBA that "unequivocally permitted the discharge of a union driver for committing a single major chargeable accident"); *Whitten v. Anchor Motor Freight, Inc.*, 521 F.2d 1335, 1339 (6th Cir.1975) ("Since the Uniform Rules [supplementing the CBA] unambiguously provide for what action the employer may take when an employee is involved in an accident, no issue of 'just cause' was presented.").

Admittedly, the proposition advanced by Riverside has the virtue of limiting judicial intervention into disciplinary matters lying at the core of an employer's interest in controlling the workplace. It also enjoys the support of certain principles of contract law. Ordinarily, where a contract permits a party to choose among a range of actions, no breach is committed by selecting one and not another. Moreover, a party's choice of one of these options in one instance—here, for example, Riverside's decision in 1995 to suspend and not discharge a health care worker found sleeping in the mental health unit—typically does not operate as a waiver of the right to choose a different option in the future. However, the Court has found no direct support in the case law for the application of these basic contract-law principles to a breach-of-CBA claim under the LMRA. In addition, the Court here need not engage in open-ended second-guessing of Riverside's business judgment, but instead is guided by factors found in the CBA itself which control Riverside's exercise of its discretion.

of an employee's misconduct, an employer surely is entitled to consider the *possible* adverse consequences of the conduct in question, even if those consequences do not occur in each and every instance. In this case, Plaintiff concedes that she was principally responsible for the safety of the patients and staff in the mental health unit, and that some of the patients in the unit were "combative." Under these circumstances, Riverside reasonably could have concluded that the potential for trouble was great, even if Plaintiff's particular violation failed to produce any identifiable adverse consequences. Moreover, it is worth noting that Riverside's "Standards of Conduct" do not distinguish sleeping-on-the-job violations by the length of the violation, but instead flatly prohibit such conduct for *any* length of time. The Court declines to second-guess this judgment.

Next, while Plaintiff insists that her employment record was good, that record included a reprimand for the very misconduct at issue here, sleeping on the job. Although this reprimand arose from the conduct of an employee supervised by Plaintiff, and not Plaintiff herself, it never-

theless should have served to alert Plaintiff to the express prohibition against sleeping on the job. Riverside also made Plaintiff aware of this rule on at least three other occasions, each time reminding her that any violations could result in her discharge. Similarly, regarding Plaintiff's ability to correct her conduct, her violation of Riverside's sleeping-on-the-job rule in the face of these prior warnings casts doubt on her ability or willingness to avoid further violations in the future.[10]

Further, while neither of the other two health care workers found sleeping in the mental health unit was discharged,[11] the record fails to disclose that either of these two employees had received a prior reprimand relating to sleeping on the job. More significantly, the record affirmatively discloses that neither of these two employees held a supervisory position. In contrast, Plaintiff not only supervised the other workers in the mental health unit, including one of the workers found sleeping on the job, but she also was responsible for all of the patients in the unit. Thus, the evidence pointed to by Plaintiff

---

**10.** Moreover, it almost goes without saying that Plaintiff's deposition testimony as to her repeated, flagrant and clandestine violations of the sleeping-on-the-job rule establishes to a virtual certainty that she would have continued violating this rule in the future.

More generally, it is worth asking what role this troubling after-acquired evidence of misconduct should play in this case. Defendants largely disavow any reliance on this evidence in their motions on the question of liability; instead, Riverside primarily cites this evidence in support of its separate motion for partial summary judgment on the question of damages, relying on the Supreme Court's decision in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Yet, *McKennon* involved a claim of age discrimination, and the Court's ruling rested in no small part on the objective of the federal antidiscrimination statutes to eliminate discrimination in the workplace. 513 U.S. at 357–60, 115 S.Ct. at 884–85. Because this same public policy concern is not present in state-law breach-of-contract suits, some courts have held that *McKennon* does not preclude the use of after-acquired

evidence as a defense to liability for such a breach. *See, e.g., Schiavello v. Delmarva Systems Corp.*, 61 F.Supp.2d 110, 114–15 (D.Del. 1999); *O'Day v. McDonnell Douglas Helicopter Co.*, 959 P.2d 792, 793–96 (Ariz.1998). Further, the present case does not implicate *McKennon*'s concern that "employers might as a routine matter undertake extensive discovery into an employee's background or performance on the job to resist claims" asserted by discharged employees. *McKennon*, 513 U.S. at 363, 115 S.Ct. at 887. Rather, in this case, much of the after-acquired evidence came from the testimony of Plaintiff herself, other evidence was provided to Riverside by co-workers shortly after Plaintiff's discharge and well before this suit, and all of this evidence merely corroborated Riverside's prior determination that Plaintiff slept on the job. In any event, the Court need not decide whether *McKennon* applies here, as the information available to Riverside at the time it decided to discharge Plaintiff was sufficient to justify the discharge under the CBA.

**11.** As noted earlier, one was suspended for three days, and the other was given a written warning.

fails to establish, or even suggest, that other, similarly situated employees who committed the same or a similar violation were subject to more lenient disciplinary action. Consequently, having considered the factors set forth in the "Standards of Conduct" in light of the evidentiary record, the Court finds no support for Plaintiff's claim that Riverside's decision to discharge Plaintiff was unreasonable, arbitrary, or otherwise outside the bounds of the discretion conferred by the CBA.

Finally, just as Plaintiff has failed to identify any evidence that the disciplinary action in this case was out of proportion to actions taken by Riverside with regard to other employees under comparable circumstances, Plaintiff also has failed to identify any legal authority to sustain her contention that the penalty imposed here was unduly harsh or arbitrary. In her response to Defendants' motions, Plaintiff cites two arbitral decisions as purported authority for the proposition that discharge typically is too harsh a penalty for a sleeping-on-the-job infraction.

As Local 79 points out in its reply brief, however, these decisions not only lack precedential value, but actually serve to highlight the important distinctions between cases where discharge might be unduly harsh and cases where this penalty is appropriate. Specifically, these arbitral decisions differ from the present case in the following respects: (i) neither involved a health care professional, much less a charge nurse with primary responsibility for the safety of staff and psychiatric patients, some of whom were combative; (ii) neither involved an employee with supervisory responsibilities; and (iii) neither involved an employee who had previously been warned about violating a sleeping-on-the-job rule. Because all of these circumstances are present here, the Court finds ample support in the record for Riverside's decision to discharge Plaintiff.

In sum, while the Court cannot say for certain whether an arbitrator might view the situation differently, given the more informal nature of the arbitration process and the broader considerations that often play a part in that process, *see Ruzicka I,* 523 F.2d at 314–15 (comparing judicial and arbitral resolution of grievances), the Court concludes that Riverside's discharge of Plaintiff for sleeping on the job fully comports with the plain terms of the CBA. Accordingly, because this necessary breach-of-contract element of Plaintiff's claims is lacking as a matter of law, the Court holds that Defendants are entitled to summary judgment on Plaintiff's hybrid § 301 claims.

### IV. *CONCLUSION*

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant Riverside Osteopathic Hospital's Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that Defendant Service Employees International Union Local 79's Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that, in light of the disposition of these two motions, Defendant Riverside Osteopathic Hospital's Motion for Partial Summary Judgment on the issues of back pay, front pay and economic damages is DENIED AS MOOT.