**Edgar P. DAMPHOUSSE, Plaintiff,**

v.

**GREAT LAKES STEEL, et al., Defendants.**

No. 00–CV–73631.

United States District Court, E.D. Michigan, Southern Division.

Aug. 14, 2002.

Hugh M. Davis, Jr., Constitutional Lit. Associates, Detroit, MI, for plaintiff.

Mark W. McInerney, Jack VanHoorelbeke, Detroit, MI, for Great Lakes Steel, Dennis McDermott, Larry Flynn, Jack LeFeve, John Bernard, Alan DeGraw, Nat. Steel Corp., defendants.

Bruce A. Miller, Eric I. Frankie, Miller Cohen, Detroit, MI, for United Steel Workers of America, Local 1299, United Steel Workers of America, AFL-CIO, Dist. 2, United Steel Workers of America, AFL-CIO, United Steel Workers CLC Dist. 2, defendants.

*OPINION AND ORDER GRANTING UNION'S MOTION FOR SUMMARY JUDGMENT*

STEEH, District Judge.

Defendants United Steel Workers of America AFL–CIO District 2, United Steel Workers of America Local 1299 and United Steel Workers of America AFL–CIO, CLC District 2 (collectively referred to as "Union") move for summary judgment of plaintiff Edgar Damphousse's claim of breach of a duty of fair representation. A hearing on the motion was held on July 15, 2002. For the reasons set forth below, defendant Union's motion for summary judgment will be GRANTED.

## I. Background

Plaintiff originally filed suit in Michigan's Wayne County Circuit Court on July 6, 2000 alleging tortious interference with contract/beneficial economic relationship, and unlawful discrimination in violation of Michigan's Elliott–Larsen Civil Rights Act, M.C.L. §§ 37.2101 *et seq.*, against his former employers defendants Great Lakes Steel ("GLS") and National Steel Corporation ("NSC"), and against former supervisors Dennis McDermott and Jack Lefeve, former crew coordinator John Bernard, GLS Labor Relations Representative Larry Flynn, and GLS Labor Relations Attorney Alan DeGraw. The matter was removed to federal court on August 11, 2000 based on federal question jurisdiction under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"). Plaintiff filed a First Amended Complaint on November 6, 2000 adding Union as defendants and alleging Union breached its duty of fair representation by deciding not to pursue arbitration of GLS's April 27, 1999 decision to discharge plaintiff. On March 22, 2002, the court issued an automatic bankruptcy stay as to GLS and NSC only. Union filed the instant motion for summary judgment on May 13, 2002.

Plaintiff filed a motion to stay as to all parties on May 17, 2002. The motion was denied on June 25, 2002.

## II. Motion For Summary Judgment

Union moves for summary judgment arguing that, in this hybrid LMRA action, plaintiff cannot prove that Union's decision not to pursue arbitration was arbitrary, discriminatory, or made in bad faith. Union asserts it is undisputed that on January 27, 1999, after plaintiff received a January 26, 1999 five day suspension letter, plaintiff left work and drove to Riverside Hospital where he was treated by a Dr. Nasry for emotional distress resulting from the suspension. Union asserts plaintiff threatened to "kill his boss", prompting Dr. Nasry to call Ecorse Police, who in turned notified GLS Security. Union continues that, on April 8, 1999, plaintiff made veiled threats of harming McDermott to plaintiff's workers' compensation attorney Kevin Kales, causing Kales to call GLS Attorney DeGraw to discuss a possible "cooling off" period. Union argues that these threats of physical violence, coupled with past disciplinary action taken against plaintiff, justified Union's refusal to arbitrate plaintiff's discharge.

Plaintiff counters that the alleged threats were made off company property, and that proffered arbitration decisions demonstrate that arbitration challenges to discharge were successful in 16 of 46 cases where threats were made *on* company property. Plaintiff continues that his alleged threats were made under circumstances where the threats were privileged (physician-patient privilege as to Dr. Nasry, attorney-client privilege as to Attorney Kales), making it unlikely that plaintiff's hearsay statements would be admissible at arbitration. Plaintiff continues that GLS Labor Relations representative Michael Flynn testified that Union pursued arbitration in three other cases involving more immediate threats, with one involving a knife and another involving an actual physical assault. Plaintiff continues that Union knew plaintiff's work history involved a patten of personal attacks by McDermott and co-workers, including the posting of cartoons describing plaintiff as "whining" and an "80 inch mill reject", and the displaying of a local newspaper story reporting unrelated theft charges brought against plaintiff. Plaintiff summarizes that, given these circumstances, Union's decision not to arbitrate plaintiff's discharge was irrational. In the alternative, plaintiff asserts that summary judgment would be premature because discovery has been stayed as to GLS and NSC.

### A. Standard of Review

The standard for determining whether summary judgment is appropriate is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Winningham v. North Am. Resources Corp.*, 42 F.3d 981, 984 (6th Cir. 1994) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir.1989)). The evidence and all inferences therefrom must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Enertech Elec., Inc. v. Mahoning County Comm'r*, 85 F.3d 257, 259 (6th Cir.1996); *Wilson v. Stroh Companies, Inc.*, 952 F.2d 942, 945 (6th Cir.1992).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S.

253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *see also Adams v. Philip Morris, Inc.,* 67 F.3d 580, 583 (6th Cir.1995). Mere allegations or denials in the nonmovant's pleadings will not meet this burden. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party cannot rest on its pleadings to avoid summary judgment, but must support its claim with some probative evidence. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

■■■ With respect to plaintiff's claim against Union of breach of a duty of fair representation:

A union breaches its "statutory duty of fair representation * * * when [its] conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967)(internal citations omitted). This standard is stated in the disjunctive, so "the three named factors are three separate and distinct possible routes" for establishing a union's breach of its duty. *Black v. Ryder/P.I.E. Nationwide, Inc.,* 15 F.3d 573, 584 (6th Cir.1994). In *Air Line Pilots Association, Int'l v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), the United States Supreme Court clarified the meaning of "arbitrary" as it relates to a union's conduct. The Supreme Court held that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness[ ] as to be irrational." 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991)(internal quotation omitted).

Thus, poor judgement or negligence will not establish a breach of a union's duty of fair representation. *Black,* 15 F.3d at 584. And while the union's duty includes undertaking a "reasonable investigation," *Black,* 15 F.3d at 585, that duty "does not require [the] union to exhaust every theoretically available procedure simply on the demand of a union member." *St. Clair v. Local Union No. 515, Int'l Bhd. of Teamsters,* 422 F.2d 128, 130 (6th Cir.1969)(internal citations omitted). A union may breach its duty, however, if it processes a grievance in a perfunctory manner. *Milstead v. International Bhd. of Teamsters,* 580 F.2d 232, 235 (6th Cir.1978).

*LaCortiglia v. Aluminum Co. of America,* 976 F.Supp. 707, 711 (N.D.Ohio 1997).

■■■ Unexplained union inaction which substantially prejudices a union member's grievance may constitute arbitrary conduct which amounts to unfair representation. *Ruzicka v. General Motors Corp.,* 649 F.2d 1207, 1211 (6th Cir.1981). Arbitrariness "reflects reckless disregard for the rights of the individual employee." *Id,* at 1212.

[M]erely characterizing a union's conduct as "arbitrary", "perfunctory" or demonstrative of "bad faith" is insufficient to withstand summary judgment. Rather, to meet his burden of proof as to the union's breach of its duty of fair representation, a plaintiff must establish by substantial evidence that the union acted arbitrarily, discriminatorily or with bad faith. *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971); *Ratkosky v. United Transportation Union,* 843 F.2d 869 (6th Cir.1988)(summary judgment granted where plaintiff fails to make a showing of bad faith, discrimination or arbitrary conduct).

*Kaiser v. United States Postal Service,* 785 F.Supp. 648, 660 (E.D.Mich.1992).

## B. Record Evidence

Plaintiff was hired by GLS in 1976. Sometime in 1995–1996, plaintiff transferred or "bid" into the Locomotive Cranes department, where Dennis McDermott was his supervisor. Plaintiff primarily operated overhead electrical cranes in the GLS Main Plant. According to plaintiff, in 1997, someone posted various unflattering cartoons of plaintiff throughout the Plant. Plaintiff suspected that his union co-workers posted the cartoons, and that McDermott made little or no effort to have them removed. In January 1997, plaintiff received a five day suspension for accidently driving a "coil hyster" [1] into an automobile parked alongside railroad tracks. Plaintiff testified at his deposition that crew coordinator Bernard ordered him to operate the coil hyster even though plaintiff told Bernard that he was not qualified to run the machine. The suspension was reduced to four days as the result of plaintiff's grievance.

On June 10, 1997, plaintiff received another five day suspension after being accused of being off GLS property with GLS equipment, a "front end loader." Plaintiff testified that he was instructed by crew coordinator Maynard to clean up the GLS parking lot of debris, and that he would be paid four hours overtime. Plaintiff stated that Mobile Equipment Foreman Lefeve watched plaintiff, then reported that plaintiff had been off company property with the GLS equipment, placing debris from plaintiff's own business into a GLS dumpster. Plaintiff denied the charges. The suspension was converted to discharge on June 25, 1997, but following a grievance, was reduced to a 20 day suspension in August 1997. Plaintiff testified he believed that Lefeve gave the information to McDermott, asking McDermott if he could use the information against plaintiff. According to plaintiff, harassment by union co-workers and the posting of cartoons resumed in August 1997, with one cartoon stating "Hit the bricks Bozo." Plaintiff testified the cartoon was underneath a sheet of plexiglass on crew coordinator Bernard's desk.

In September 1997, plaintiff was charged with the crime of theft of a backhoe from a construction site near plaintiff's home. Plaintiff explained that he left equipment he owned on the property with a note stating he was using the backhoe. Plaintiff was convicted of the lesser crime of illegal use of an auto without intent to steal. The charges were unrelated to GLS. Copies of a local newspaper article reporting the incident were posted inside GLS. Plaintiff testified crew coordinator Bernard told him he could rightfully post the articles because they were a matter of public record. Plaintiff believes McDermott was behind getting the article published because McDermott had worked in Taylor, Michigan and knew people that worked for the newspaper.

On October 13, 1997, plaintiff received a five day suspension, which was converted to discharge on December 15, 1997. The discharge was issued based in part on an incident related to crew coordinator Bernard's posting of the newspaper article. Plaintiff explained that, as he was ending his midnight shift, he pulled up in a GLS truck near Bernard and asked Bernard why he had posted the newspaper story. Plaintiff was accused of almost hitting Bernard with the truck. Plaintiff testified McDermott had the articles taken down only after plaintiff confronted him. The December 15, 1997 discharge was also based on an incident in which plaintiff reported to work on the afternoon shift, and saw a copy of the newspaper article posted behind a piece of plexiglass mounted on the wall. Plaintiff testified that,

---

1. Plaintiff described a "coil hyster" as a "massive forklift."

while removing the plexiglass, the plexiglass accidently cracked. Plaintiff maintained that the plexiglass was owned by co-worker Boedigheimer. Plaintiff was further cited for being out of his area, although plaintiff maintained that he had been ordered to work in the area by his crew coordinator Maynard. Plaintiff testified at his deposition that he was told if he "bid out" to the Locomotive Cranes department on Zug Island, away from the Main Plant and McDermott, he would be reinstated. Plaintiff accepted the offer and was reinstated effective March 29, 1998. As a condition of reinstatement, plaintiff was disqualified from the Main Plant Locomotive Crane department, initially transferring to the Locomotive Cranes department on Zug Island, under the supervision of one Gary Gross. Plaintiff testified he continued to be harassed at Zug Island.

Plaintiff received no disciplinary citations during the seven to eight months he worked in the Zug Island Locomotive Cranes department. Plaintiff bid into the Zug Island General Labor department as a truck driver in December 1998. Plaintiff testified he changed departments to get away from the harassment of co-workers talking about the prior incidents at the Main Plant. Gross remained his supervisor. As a new truck driver, plaintiff was required to undergo two weeks of training to learn any extra features on the various trucks he would be required to drive, and to learn the different "pick-up and drop-off points." Kathy Straub, a black female, was assigned to train plaintiff. Plaintiff testified that, during his second day of training, he and Straub traveled to the Main Plant for the purpose of having Straub show him where the "on-road" fuel was situated. Plaintiff testified he was spotted by his former crew coordinator Bernard in the Main Plant area.

A. (by Plaintiff) .... He did stop me and ask me, "What are you doing over here, in this area?"

Q. "He" Bernard?

A. Him meaning Bernard, asked me, "What are you doing in this area?"

I said, "I'm coming to get the clipboard. I was instructed by my break-in person to find out how to mark gallons on the sheet and the truck number".

Q. Were you in the truck when Bernard stopped you?

A. I was walking through the office to find out where the clipboard was.

Q. Where was Cathy Straubb?

A. She was in the truck waiting for the fuel tank to clear because it was fueling up the tank that we were to get fuel out of. On-road fuel this is, which the 80-inch only carry in McDermott's area.

Zug Island does not carry on-road fuel. They carry off-road only, which is red fuel.

Plaintiff's April 24, 2001 Deposition Transcript, at 122–123. On January 26, 1999, plaintiff was issued a five day suspension for being off his job without permission.

Plaintiff testified that, after he received this written suspension at work, he began driving home, but then decided to drive to a hospital because he was so angry and emotionally upset that he believed he was driving poorly. Plaintiff stated that he recalled that McDermott had threatened in early 1997 that he would get plaintiff fired one way or another, making plaintiff even more angry and nervous. Plaintiff drove to Riverside Hospital. After being given medication and examined by a doctor, plaintiff was transported to St. John's Mercy Hospital where he was treated by his physician Dr. Kai Anderson. Plaintiff was then driven home by his father.

The doctor that first treated plaintiff at Riverside Hospital was a Dr. Nasry. Ac-

cording to a January 27, 1999 Ecorse Police Department Daily Report:

0155

99–846 .. P/C .. RIVERSIDE HOSPITAL DR. NASRY INFORMING HE IS TREATING A EDGAR DAMPHOUSSE EX–EMPLOYEE OF G.L.S. WHOM WAS FIRED TODAY FROM WORK AND IS THREATENING TO GO AND KILL HIS BOSS/ G.L.S. SECURITY NOTIFIED.

Defendant's Exhibit C. Plaintiff testified that he could not remember anything that he had said to Dr. Nasry.

Plaintiff further testified that he met with Attorney Kevin Kales at Kales' office on April 8, 1999 to discuss the January 27, 1999 incident. Plaintiff told Kales he felt that "Dennis McDermott had went behind to dig up information to get me and reach down to Zug Island to get me, even though I am not in his area." Plaintiff's April 24, 2001 Deposition Transcript, at 438. Plaintiff stated that, after talking to Kales about McDermott, Kales suggested that he go home and relax, and that Kales would make a few phone calls. Plaintiff testified Kales later told him that he, Kales, called GLS Labor Relations Attorney Alan De-Graw.

According to DeGraw's notes of a phone conversation with Kales on April 9, 1999:

Kevin [Kales] was concerned, because it was obvious that ED [Edgar Damphousse] is on a lot of "psychological medication," and he was saying things like:

"So far I have done the right thing ... I've got 5 acres of property, and I've been shooting my guns there so far. I don't want to lose everything I've got."

ED mentioned the possibility of bringing harm to Dennis McDermitt [sic] in a general fashion 3 times. During Kevin's meeting with ED yesterday, 4/8/99.

ED did not make a direct threat, or say that he was going

ED says Dennis McDermitt is always picking on him. Believes DM has a secret plan to get ED.

Kevin also indicated that ED was currently on a disciplinary suspension ... and would probably have a hearing soon.

Defendant's Exhibit D. Plaintiff denied at his deposition making any threats against McDermott.

Attorney Kales responded to Attorney DeGraw's memo on April 26, 1999:

On Friday, April 23, 1999, I received a copy of the memo composed by Alan DeGraw, attorney for Great Lakes Steel, concerning my conversation with Edgar Damphousse. This will clarify my transaction with Mr. DeGraw.

I called DeGraw because I felt it would be of significant assistance to my client and the employer to diffuse a volatile situation by delaying an impending hearing on termination for a "cooling off" period.

Mr. Damphousse had indicated that he was taking medication for a psychological condition. It was apparent to me that he was very agitated.

I did not tell Mr. DeGraw that Mr. Damphousse had made any explicit threat, nor that Mr. Damphousse had any plan to kill Dennis McDermitt [sic].

In view of Mr. Damphousse's obvious concern about his supervisor's repeated accusations and initiation of disciplinary action, and his agitated state, I believe the responsible, professional action, with my client's interest being foremost, was to attempt to initiate action which would result in a "cooling off" period.

I explained this to Mr. DeGraw, and he agreed with me. Instead of a "cooling off" period, it is my understanding

that the employer decided to proceed with the disciplinary hearing. .

Defendant's Exhibit E.

On April 27, 1999, GLS converted plaintiff's January 26, 1999 suspension to discharge:

> .... [T]he Company concludes that your suspension will . be converted to discharge for the following reasons:
>
> Threatened to kill and bring harm to Great Lakes Division Supervision.
>
> Off the job without permission.
>
> Violation of Company Notice dated 8/1/89 regarding unauthorized use of a Company vehicle.
>
> Violation of reinstate conditions as set forth in the settlement of Grievance 943–X as outlined in the letter dated 4/1/98.
>
> Prior record of misconduct.

Defendant's Exhibit A.

Union Staff Representative Harry Gray testified that, as of June 14, 1999, he replaced Larry Bryant as the Union representative responsible for deciding whether to advance a third-step discharge decision to arbitration. Gray explained that if a discharge decision is not resolved at the third-step, the Union may procedurally advance the grievance to the "three and a half" step level, placing the grievance on the arbitration list and arranging a prearbitration meeting. Gray stated that placement on the arbitration list does not constitute the Union's decision to arbitrate a grievance, but not placing the grievance on the arbitration list ends the grievance. Gray further explained that, after the third-step meeting, GLS generates a set of minutes and the parties' positions, which is made available to Union for review. There is no formal time table for the submission of this third-step summary, but once the Union representative such as Gray signs the summary, the grievance is advanced procedurally to the arbitration procedure; the Union representative may also withdraw the grievance after receiving the third-step meeting summary. Gary expressly testified that "The decision to arbitrate or not is mine." Gray's February 4, 2002 Deposition Transcript, at 100.

GLS Labor Relations Representative Larry Flynn testified that plaintiff's third-step hearing was held on July 28, 1999, and that he informed Union shortly thereafter that GLS was going to uphold their discharge decision. Flynn further testified that he "had this particular third step disposition letter typed up at some point in time, I don't recall exactly when, and had it available for signature, and for whatever reason, it just never got signed until the summer of 2000. I had signed it, but the union hadn't been in to sign it. I don't know why." Flynn's January 29, 2002 Deposition Transcript, at 161. After reviewing the third-step document, Flynn surmised that he had signed it on October 1, 1999. *Id.*

Union Representative Gray testified that he met with plaintiff on October 25, 1999 to discuss the situation. Gray stated that he knew plaintiff wanted to pursue a permanent and total disability retirement from GLS, then went on to explain:

A. (by Gray) Arbitrators won't put people back to work if they are engaged in violence or threats of violence unless there is some particular reason. So you have to study a case and try to find whether or not you can justify advancing it to arbitration these days.

Q. . Okay. Well, did you tell Mr. Damphousse that on -

A. Yeah.

Q. 10/25/99?

A. Yes, I did.

Q. That you couldn't get him back to work because of the violence or threats of violence?

A. I think his blood ran cold before my very eyes when I let him know of the realities of the situation. Here you come over for a friendly conversation and a chat, and I might have scared the shit out of him. But the realities were I need something here, and what I need, Edgar, to do is, one, go to Dr. Nassery and either refute what was said, or get something from her that says that this call that she or he made to the Ecorse Police Department wasn't true.

I mean, that phone call may have sealed Edgar's fate. Because what I am looking at in the file is a security guard's report that talks about a call from the Ecorse Police Department, and the desk sergeant's contemporaneous note from the doctor that made the claim, and now I got a doctor who has a doctor-client privilege taking this unusual step, in my mind, to call the Ecorse Police to warn Great Lakes Steel that the patient she's treating may—is be posing threats to a supervisor.

That is serious. We lost arbitration cases with less than that.

Gray's February 4, 2002 Deposition Transcript, at 105–106. Plaintiff admitted meeting with Gray in the Fall of 1999. Gray described three GLS discharge cases that went to arbitration and the discharge was upheld: (1) an employee showed a picture of a gun to a fellow employee on company property, said she had one like it at home, and told the employee she should bring it into work to "make things right"; (2) a minor physical altercation between an employee and a supervisor on GLS property, and; (3) a violent physical assault off GLS property at a bar. Flynn likewise cited these three discharge cases, and a fourth discharge that was upheld in arbitration where an employee holding a knife threatened to cut a co-worker's throat. Gray testified that, on average, approximately one out of every ten GLS discharge grievances proceeds to arbitration. Gray

also pointed out that hearsay evidence is admissible at GLS arbitration proceedings.

Gary also testified that, as of the January 26, 1999 suspension, plaintiff was working under two "last-chance agreements" negotiated in prior grievances. With respect to these "last chance agreements", plaintiff testified:

Q. Were you on a last-chance agreement based on the discipline prior to your discharge?

A. (by Plaintiff) That's what the company had put in there and agreed with the union on it. I didn't feel that it was proper or right, and I told [Gray] that.

Q. Would you agree with me that the last-chance agreement provides, generally, that if there's another instance of discipline you could be fired?

A. That they could fire me for anything; safety glasses, anything.

Q. And that could happen as a result of a last-chance agreement?

A. If it's put on paper, then that's what would be stated. That's why I didn't want it on my record, that second one, because they had been prior build-up for this reason.

Q. For whatever reason, though, the last-chance agreement was on your record prior to your discharge of April of '99?

A. Yes, it was.

Plaintiff February 4, 2002 Transcript, at 109–110.

Union Representative Gray further testified that in January or February 2000, he again met with plaintiff. According to Gray, plaintiff provided Gray with a copy of the letter.

A. (by Gray) This letter is dated January 5, and it's To Whom It May Concern, and its from K–A–I Anderson, M.D. And it said, Mr. Damphousse has been under the care of the writer since

October '97 for treatment of an emotional illness. Due to the symptoms, he has been unable to work for Great Lakes since 1/27/99. His symptoms were precipitated by the exasperated—exacerbated by work-related stressors. Although he has improved, he is unable to return to work for Great Lakes as this will exacerbate his illness.

Well, now I got another problem. I can't go to arbitration and win a permanent and total disability. Its just not an option.

Q. You mean it's not an option legally, or it's not an option with that letter?

A. It doesn't happen that way. That's not how you do it.

MR. FRANKIE: Through arbitration?

A. You don't go through arbitration to achieve that. So this isn't going to help me at arbitration, because what she's just said to me, that he may still be a threat. I think it could be reasonably interpreted that if he's put back in that environment—and I asked Edgar about that when he gave me this document. I said, Edgar, this doesn't say that you were totally and permanently disabled from working. It just said that you can't go back to Great Lakes. The thing I'm concerned about here is it says that you can [sic] go back in there because it will exacerbate your illness . . . . .

Gray February 4, 2002 Deposition Transcript, at 135–136. Plaintiff denied giving Gray a copy of the letter. Gray stated he told plaintiff he would not sign the third-step minutes "until I absolutely have to", with plaintiff responding that he wanted to sue GLS. *Id,* at 137. Gray testified he signed the three-step minutes on August 1, 2000, withdrawing plaintiff's grievance. Gray testified he was unaware on August 1, 2000 that plaintiff had filed a lawsuit against GLS. GLS Labor Relations Representative Flynn could not "say with certainty" whether plaintiff's grievance was officially closed before he received a copy of plaintiff's civil complaint in the mail. Flynn January 29, 2002 Deposition Transcript, at 165. Plaintiff was notified in an August 4, 2000 letter from Gray that "the Union has decided not to pursue your grievance to arbitration on the basis that it lacks merit." Defendant's Exhibit B.

### C. Analysis

■ Construing the pleadings and evidence in a light most favorable to plaintiff, plaintiff has failed to come forward with sufficient evidence that would allow a jury to conclude that the Union's August 1, 2000 decision not to arbitrate plaintiff's April 27, 1999 discharge was discriminatory, arbitrary, or made in bad faith. *Kaiser,* 785 F.Supp. at 660 (and cases cited therein). Plaintiff has not advanced evidence or argument that Union's decision was discriminatory, based upon impermissible criteria such as race or gender.[2]

■ In light of the legal and factual landscape that existed as of August 1, 2000, when Union Staff Representative Gray decided on behalf of Union not to pursue arbitration, reasonable jurors could

---

**2.** To the extent plaintiff argues that his trainer Kathy Straub, a black female, was given only a written warning for being out of place in January 1999, plaintiff has failed to show that Straub was a similarly situated employee with respect to Union's decision not to arbitrate. *See Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992)(reasoning that "to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").

not disagree that the decision not to pursue arbitration was rational. *Winningham*, 42 F.3d at 984; *Air Line Pilots*, 499 U.S. at 67, 111 S.Ct. 1127. Plaintiff was admittedly working under two "last-chance agreements" in January 1999, which would have themselves, according to plaintiff, supported his discharge for any type of infraction. Prior to August 1, 2000, plaintiff did not provide Union with evidence to refute that he had threatened to kill McDermott on January 27, 1999, and that he had again made indirect threats of violence on April 8, 1999, prompting Attorney Kales to ask for a "cooling-off" period. Plaintiff does not dispute Gray's testimony that hearsay evidence is admissible at GLS arbitration proceedings. Gray's and Flynn's undisputed testimony establishes that GLS discharge cases involving violence were, in the past, upheld after arbitration. Gray's testimony that only one in ten discharge cases proceeds to arbitration evidences that Union did not deviate from any past practice of pursuing all discharge cases through arbitration. This is not a case of "unexplained inaction" by Union. *See Ruzicka*, 649 F.2d at 1211. Neither could Union's conduct be viewed as "reckless." *Id.* Rather, the record demonstrates beyond dispute that Union made a rational decision not to pursue arbitration.

Plaintiff proffers a plethora of published arbitration decisions in which discharges resulting from threats made on company property were reversed at arbitration, and argues that he has found no case where a discharge involving threats made off company was upheld in arbitration. Plaintiff does not dispute, however, that the four discharge cases pursued through arbitration by Union, against GLS, were unsuccessful. Further, Union was under no duty to pursue arbitration simply because other unions had been successful against other employers in 16 of 46 discharge cases that proceeded to arbitration; Union owed a duty to act rationally in light of the legal and factual landscape that existed as of August 1, 2000. *Air Line Pilots*, 499 U.S. at 67, 111 S.Ct. 1127. Union's knowledge that plaintiff had complained of McDermott and co-workers in the past does not, even construed in a light most favorable to plaintiff, convert Union's decision not to arbitrate into an arbitrary, reckless act.

■ Plaintiff argues that Union made its August 1, 2000 decision not to arbitrate only after plaintiff initially filed his lawsuit against GLS and the Individual Defendants on July 6, 2000. Plaintiff alleges in his First Amended Complaint:

47 ... Plaintiff's grievance went to Step 3 at the district level.

48. Throughout the grievance process, Plaintiff continuously inquired to both the local and district unions about the status of his grievance.

49. Harry Gray, at District 2, told plaintiff that the union would hold off.

50. Gray further told plaintiff Damphousse to first pursue his workers' compensation claim and to get an attorney for a discrimination claim.

51. Gray repeatedly told Plaintiff that District 2 would hold off until those actions were taken.

52. Gray also told Plaintiff that he was first or second on the arbitration list, and that plaintiff's case was going to be arbitrated.

First Amended Complaint, at 8. With respect to paragraph 52, plaintiff testified that Gray told him in the Fall of 1999 that plaintiff's case was going to be arbitrated. With respect to paragraph 50, plaintiff testified:

Q. So you are saying that Mr. Gray was telling you to get an attorney to sue the company?

A. (by Plaintiff) Yes.

Plaintiff's July 24, 2001 Deposition Transcript, at 176.

Based on plaintiff's own testimony and allegations, Gray *encouraged* plaintiff to sue GLS, and even agreed to "hold off" the grievance process *until* plaintiff hired an attorney to purse a discrimination claim against GLS. It is undisputed that GLS Representative Flynn signed the third-step document on October 1, 1999, well before plaintiff initially filed suit on July 6, 2000 alleging *inter alia* unlawful discrimination against GLS and NSC. It is also undisputed that Union Staff Representative Gray held off the Union's decision whether to arbitrate until August 1, 2000, after plaintiff hired his present Counsel and filed a discrimination lawsuit against GLS and NSC. Gray testified that he didn't know that plaintiff filed a lawsuit until after August 1, 2000. However, even if Gray did know about the lawsuit, such would establish that Gray acted in good faith, honoring his alleged statements to plaintiff that he, Gray, would "hold off until" plaintiff hired an attorney to pursue a discrimination claim against GLS and NSC. The record does not support a finding that Union held off its arbitration decision, as allegedly promised to plaintiff, in bad faith. *Kaiser*, 785 F.Supp. at 660 (and cases cited therein).

 Plaintiff argues in a conclusionary fashion that summary judgment would be premature at this time because discovery has yet to be completed with respect to defendants GLS and NSC, citing 22 additional items including the depositions of Mary Warren, Ted Maynard, John Sadvery, Kathy Straub, "Havican" and Dennis Huck. Pursuant to Federal Rule of Civil Procedure 56(f), a party opposing a motion for summary judgment may file an affidavit stating why more discovery is needed. *See Plott v. General Motors*, 71 F.3d 1190, 1196 (6th Cir.1995). Plaintiff states by way of affidavit that more discovery is needed because these proceedings have been stayed with respect to GLS and NSC due to NSC's filing of bankruptcy. As reasoned by the court in its June 25, 2001 Opinion and Order denying plaintiff's motion to stay these proceedings as to Union and the Individual Defendants, GLS and NSC need not be parties to this action to adjudicate plaintiff's claim of breach of duty of fair representation as alleged against Union. A party invoking Rule 56(f) must affirmatively demonstrate how postponement of a ruling on a motion for summary judgment will enable him to rebut the movant's showing of the absence of a genuine issue of fact. *Good v. Ohio Edison Co.*, 149 F.3d 413, 422 (6th Cir.1998). Plaintiff has made no such affirmative showing, to wit, how the depositions or other listed discovery material related to GLS and NSC will enable plaintiff to demonstrate that Union's decision not to arbitrate was discriminatory, arbitrary, or in bad faith.

## III. Conclusion

Defendants Union's motion for summary judgment of plaintiff Edgar Damphousse's claim of breach of a duty of fair representation is hereby GRANTED. Plaintiff's claim of breach of a duty of fair representation is hereby DISMISSED with prejudice. Union is hereby DISMISSED from this lawsuit, as there are no remaining claims alleged against Union.

SO ORDERED.